## CENTRAL R. CO. OF NEW JERSEY v. MARTIN, State Tax Commissioner, et al.*

## LEHIGH VALLEY R. CO. OF NEW JERSEY v. SAME.

District Court, D. New Jersey.
April 5, 1933.

Maximillian M. Stallman, of Newark, N. J., Robert J. Bain, of Jersey City, N. J., and Alexander H. Elder and Jervis Langdon, Jr., both of New York City, for plaintiffs.

William A. Stevens, Atty. Gen. (Duane E. Minard, of Newark, N. J., Edward P. Stout, of Jersey City, N. J., and John Solon, of counsel), for defendants.

CLARK, District Judge.

The principal case seems to present a problem in method. It is agreed that for many years the taxing authorities of New Jersey have indulged in the amiable practice of assessing railroad property at 100 per cent. and the property of all its other citizens (sic) at 80 per cent., perhaps an ancient application of the now so popular capacity to pay principle. It is also agreed that this form of assessment presents an issue under the Federal Constitution. It follows, of course, that its ultimate resolvement rests with the United States Supreme Court, and this, too, is conceded.

*Decree vacated 65 F.(2d) 613.

At this point the litigants part company. The railroads insist that this important question should first be considered by the inferior United States courts. They have filed their bill before us as the first step in this process. The state, on the other hand, is convinced that the inevitable appeal to the United States Supreme Court should come only after the intermediate and highest courts of New Jersey have refused relief.

At first blush, this difference seems, like Mr. Wilson's famous comparison of the two political parties in New Jersey, a mere matter of Tweedledum and Tweedledee, and therefore not worth any intellectual strain upon honorable courts. One might suppose that the selection of a forum should be left to caprice rather than to contest. That it is not so left is attested by an impressive body of authority in the United States courts. We find aggrieved corporations continually seeking our courts and being met as often by the plea that they should first exhaust their remedies in the state courts.

At the outset we find a rather puzzling situation disclosed by the decisions of the United States Supreme Court. There have been, as we have indicated, many bills to enjoin state administrative bodies filed in the United States courts. In fact, regulation and injunction have become like night and day. In our very humble judgment, the highest court got off on the wrong foot in its consideration of the first of these cases. In the famous case of Smyth v. Ames, 169 U. S. 466, 516, 18 S. Ct. 418, 42 L. Ed. 819 (1897), the court turned a deaf ear to the plea that the concurrent jurisdiction of equity was improperly invoked. It appeared that the regulating statute of Nebraska, which fixed the rates objected to, provided for an appeal to the Supreme Court of the state, if the rates fixed were unreasonable and unjust. This the court found irrelevant. It was the court's opinion that the remedy whose adequacy was required by ancient doctrine must be in the United States court.

This seems to us a misconception of a fundamental of equity jurisprudence. The Chancery Court owes its very origin to the failure of the common-law courts to redress individual wrongs. It was the individual injustice that moved the king's conscience. Obviously, it can be of little concern to the individual that he obtains relief in one court rather than another. Relief is what he is after, and who pays the judge's salary may be

interesting, but is surely unimportant. So equally we submit it is unimportant in its bearing upon the adequacy of the remedy. A dual court system is a fact just like any other fact bearing upon the situation of the litigant seeking equitable redress. Just like, for instance, the facts showing a continuing trespass.

It may be that the necessity for a decision on the constitutional question obscured the apparently minor question of procedure. At any rate, the later decisions of the Supreme Court indicate a realization of error, although they do not expressly overrule. The complainant cites a group of four cases. They are all contained in the last cited, and each earlier one cites, as seems to be customary, the ones preceding it and no others. The earliest is, of course, Smyth v. Ames, already discussed. The next case, Chicago, B. & Q. R. Co. v. Osborne, 265 U. S. 14, 44 S. Ct. 431, 68 L. Ed. 878 (decided twenty-six years later), repeats the bald rule, but promptly indicates the real reason for granting relief: "That however is not the only objection. On a writ of error the Court is confined to the record. The most that it could do, it would seem, would be, if errors appeared on the face of the record, to set aside an excessive valuation and remit the matter to the same Board to try again, which is hardly satisfactory, if the Board is seeking to evade the law." Page 16 of 265 U. S., 44 S. Ct. 431.

The next case (two years later again) Risty et al. v. Chicago, Rock Island & Pacific Railway Co., 270 U. S. 378, 388, 46 S. Ct. 236, 240, 70 L. Ed. 641, prefaces its statement of the rule by the significant sentence: "The remedy by appeal to the state court under section 8469 does not appear to be coextensive with the relief which equity may give."

And finally the last case, Henrietta Mills v. Rutherford County, 281 U. S. 121, 50 S. Ct. 270, 74 L. Ed. 737 (1929), although it also states the rule, need not have done so. There was in fact a remedy on the law side of the federal court.

This last unusual circumstance really illuminates the whole fallacy. In the ordinary tax or rate case, the remedy at law is in the nature of things a matter of state procedure, state courts, and state statutes. If the rule is valid, relief can be denied by a simple statement to that effect. That is just what the cases do not do. They all discuss at more or less length the degree of adequacy of a remedy (in the state courts) which, by their own showing, is irrelevant. We find such discussion in Union Pacific R. Co. v. Board of Com'rs of Weld County, 247 U. S. 282, 38 S. Ct. 510, 62 L. Ed. 1110; Risty v. Chicago, Rock Island & Pacific Railway Co., above cited; and Atlantic Coast Line R. Co. v. Doughton, 262 U. S. 413, 426, 43 S. Ct. 620, 67 L. Ed. 1051.

In any event, and perhaps to avoid their own limitation, the Supreme Court has evoked another principle to prevent the inferior United States courts from scooping the state courts. This principle might be described rather as one of diplomacy than of technical law. It is clearly disorderly to have the national courts poking their injunctions into the administrative processes of sovereign states without giving the courts of those states an opportunity to discipline their own family, if discipline is needed. This diplomacy among judicial bodies is called comity, and was first applied to our particular problem in the case of Prentis v. Atlantic Coast Line Co., 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150, where the bill was suspended to await the result of an appeal to the Virginia Court of Appeals.

As we study the application of this comity by the Supreme Court, we discover that we have just come around the barn. In other words, comity requires the federal courts to refrain if the remedy in the state courts is adequate and not otherwise. Pacific Telephone & Telegraph Co. v. Kuykendall, 265 U. S. 196, 44 S. Ct. 553, 68 L. Ed. 975; Railroad and Warehouse Commission of Minn. v. Duluth Street Railway Co., 273 U. S. 625, 47 S. Ct. 489, 71 L. Ed. 807; Oklahoma Natural Gas Co. v. Russell et al., 261 U. S. 290, 43 S. Ct. 353, 67 L. Ed. 659. Our courts must be polite only to effective state courts—those worthy of such courtesy, because of their protection of litigants who have a dual citizenship.

The practice of discriminatory assessment, according to the cases, was an early discovery of the taxing authorities. The Supreme Court of the United States in a case decided in 1879 utters this explanation thereof, in the same breath wherein it prevents it in the particular instance. Justice Miller, speaking for the court in the case of Cummings v. Merchants' National Bank, 101 U. S. 153, at page 162, 25 L. Ed. 903, said: "It is proper to say, in extenuation of the rule of primary valuation of different species of property developed in this record, that it is not limited to the State of Ohio, or to part of it. * * * If we look for the reason for this common consent to substitute a custom for the positive rule of the statute, it will probably be found in the difficulty of subjecting personal

property, and especially invested capital, to the inspection of the assessor and the grasp of the collector. The effort of the land-owner, whose property lies open to view, which can be subjected to the lien of a tax not to be escaped by removal, or hiding, to produce something like actual equality of burden by an undervaluation of his land, has led to this result. But whatever may be its cause, when it is recognized as the source of manifest injustice to a large class of property around which the Constitution of the State has thrown the protection of uniformity of taxation and equality of burden, the rule must be held void, and the injustice produced under it must be remedied so far as the judicial power can give remedy."

In the case from which we have just quoted, the United States courts (Circuit and Supreme) had jurisdiction under the laws of the United States (the complainant being a national bank), and was able accordingly to apply the Constitution of Ohio. They decided (incidentally with the Chief Justice dissenting) that the word "uniform" in that instrument (article 12, § 2) controlled the phrase "according to its true value." They accordingly enjoined an assessment of bank shares by the board of equalization for banks and railroad companies at a value fully equal to their selling price when the state board of equalization for real estate assessed that kind of property at one-third of its actual value.

A similar view of numerous other state Constitutions has been taken by the highest courts in those states. Cocheco Mfg. Co. v. Town of Strafford, 51 N. H. 455, 482; Manchester Mills v. Manchester, 58 N. H. 38; Randell v. City of Bridgeport, 63 Conn. 321, 324, 28 A. 523; Chicago, B. & Q. R. Co. v. Board of Com'rs of Atchison County, 54 Kan. 781, 792, 39 P. 1039; Ex parte Fort Smith & Van Buren Bridge Co., 62 Ark. 461, 468, 36 S. W. 1060; Burnham v. Barber, 70 Iowa, 87, 90, 30 N. W. 20; Barz v. Board of Equalization, 133 Iowa, 563, 565, 111 N. W. 41; Iowa Cent. R. Co. v. Board of Review (1916) 176 Iowa, 131, 157 N. W. 731; Lehigh & Wilkes-Barre Coal Co. v. Luzerne County, 225 Pa. 267, 271, 74 A. 67; People v. Illinois Cent. R. Co., 273 Ill. 220, 244–250, 112 N. E. 700. There are, however, decisions in the states promulgating a contrary view. City of Lowell v. County Commissioners, 152 Mass. 375, 379, 25 N. E. 469; Central R. Co. v. State Board of Assessors, 48 N. J. Law, 1, 7, 2 A. 789, 57 Am. Rep. 516; Louisville Ry. Co. v. Com., 105 Ky. 710, 49 S. W. 486. These latter seem to proceed on the theory that it is too bad, but the only thing to be done is to raise the other assessments by appointing assessing officers of a finer sense of equity. As might be expected, the taxpayers of these latter jurisdictions finally endeavored to find the usual way out of the state judicial cul-de-sac. They appealed to our judicial brethren. Why they should have been willing to suffer so many years in injured silence is not altogether clear. One might suspect that even in these recalcitrant states the boards of equalization made some informal adjustments or else were satisfied with the first federal case in their path, i. e., Taylor v. Louisville & Nashville R. Co., 88 F. 350 (C. C. A. Tenn.), and only became adamant under pressure of the recently ended national spending extravaganza.

At any rate, the first case reached the Supreme Court in 1916. Greene v. Louisville & Interurban R. Co., 244 U. S. 499, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88. This bill was filed in the District Court for the Eastern District of Kentucky and based its jurisdictional averments on a violation of the equal protection clause of the Fourteenth Amendment. Mr. Justice Pitney, speaking for a divided court (Holmes, Brandeis, and Clarke dissenting), held the bills valid on this ground, but based his decision (as in the Cummings Case, supra) on his interpretation of the uniformity clause (section 171) of the Kentucky Constitution which he held overrode the following provision (section 172) for assessment at fair cash value. In the next case chronologically, Sunday Lake Iron Co. v. Wakefield, 247 U. S. 350, 38 S. Ct. 495, 62 L. Ed. 1154, the Supreme Court acquitted the state board of the intention or design to discriminate which they held essential to relief. So it was not until 1922 that the United States Supreme Court squarely decided that an assessment at true value (of a railroad bridge) deprived the bridge company of equal protection of the law, upon a showing that other property in the district was assessed at 55 per cent. of its true value. In so holding the court set aside on certiorari the judgment of the Supreme Court of Nebraska which had stated the proper remedy was to have the other property raised. There are, of course, numerous later decisions to the same effect. Louisville & N. R. Co. v. Greene, 244 U. S. 522, 37 S. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97; Montana Nat. Bank v. Yellowstone County, 276 U. S. 499, 48 S. Ct. 331, 72 L. Ed. 673; Cumberland Coal Co. v. Board of Revision, 284 U. S. 23, 52 S. Ct. 48, 76 L. Ed. 146; Iowa-Des Moines Nat. Bank v. Bennett, 284 U. S. 239, 52 S. Ct. 133, 76 L. Ed. 265.

480

■ In order to show inadequacy of remedy in the state courts, the plaintiffs must show, first, that those courts have already shown by their reported decisions that they will uphold the assessment complained of, and, second, that while the highest court is being reached (its processes are being invoked), they will suffer irreparable injury by some action they will be forced to take. It seems rather ridiculous to have to declare that we start with the assumption that the members of our state Court of Appeals recognize that the Constitution of the United States is the supreme law of the land. Ridiculous or not, we do have to make that declaration and that assumption because the gist of complainants' argument seems to be that any such declaration and any such assumption is entirely unwarranted.

We suppose that they do not intend to accuse the members of that court of violating their oath of office, to say nothing of being ignorant of a legal principle familiar to every first year law student. Their contention rather appears to be that the judges of our high court would not recognize the Constitution if they saw it. The short answer to this theory, is that they have not yet had an opportunity to see it. They have not been shown the constitutional interpretation by the Supreme Court which we have just tried to set forth. It may be that that interpretation is logical and just and so plainly foreshadowed in the earlier Supreme Court cases that a professor of law would have foreseen its ultimate adoption. To predict the law is—perhaps unfortunately—not the function of the courts. They expound and define it.

In that exposition the New Jersey Court of Appeals followed what they thought to be the requirements of their own Constitution. That they happened to disagree with the highest courts of some other jurisdictions is irrelevant except again for the legal theorist. The vital matter is one of calendars. Has there been a decision of the New Jersey Court of Appeals on this question which is subsequent to January 2, 1923, the day on which the Sioux City Bridge Co. v. Dakota County Case (260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979) was decided? Not by six years. The last case in New Jersey is Long Dock Company v. State Board of Assessors, 89 N. J. Law, 108, 97 A. 900, decided by the Supreme Court of New Jersey in June, 1916, and affirmed on May 24, 1917, 90 N. J. Law, 701, 702, 101 A. 367, 368. It is true that Hackensack Water Co. v. State Board, 104 N. J. Law, 48, 139 A. 410, was both de-

cided in 1927 four years after the Sioux City Case, and that that decision was expressly called to the attenton of our Supreme Court (not the Court of Appeals). At the argument and in their briefs, complainants' counsel seem to take the position that Mr. Justice Katzenbach, who wrote the opinion for the court, referred to and openly ignored that decision. We say "seem to take that position," because we are loathe to believe that such is actually their intention. As one who had the privilege of serving with Justice Katzenbach, we know that that able judge was incapable of such a legal absurdity. That he was not guilty of it quite clearly appears from the following portion of his own opinion, which we regret to say we cannot find in counsel's brief:

"The position of the prosecutor apparently is that notwithstanding the provision of the New Jersey Constitution referred to and its interpretation in decisions of our courts, that it is entitled to have the Constitution and decisions of this state superseded by the federal Constitution and the decisions of the federal courts. It is unnecessary to consider at length this proposition, because it is clear that no person is denied the equal protection of the laws if a remedy is provided by state legislation for the correction of the grievance complained of. Under section 701 of chapter 236 of the Laws of 1918 [Comp. St. Supp. N. J. § 208—66d (701)], any taxpayer aggrieved by the assessed valuation of his property, or feeling that he is discriminated against by the assessed valuation of any other property in the taxing district, may on or before June 15th file with the county board of taxation a petition of appeal setting forth the cause of complaint, the nature and location of such assessed property, and the relief sought. The purpose of this act was to prevent just such discrimination as the prosecutor complains of. There is nothing in the record which shows that the prosecutor took such action before the county board of taxation. It has refused to avail itself of the remedy afforded it by our legislation to correct the evil of which it complains. One cannot claim a deprivation of constitutional rights by ignoring the remedy provided." Page 50 of 104 N. J. Law, 139 A. 410, 411.

The appellants are not then faced with the situation presented in certain Supreme Court cases cited by appellant. Montana Nat. Bank v. Yellowstone County, 276 U. S. 499, 48 S. Ct. 331, 72 L. Ed. 673; Brinkerhoff-Faris Trust & Sav. Co. v. Hill, 281 U. S. 673, 679, 50 S. Ct. 451, 74 L. Ed. 1107. The highest court of our state will grant adequate

relief as soon as the question is presented to them. They will in the future, as they have in the past, recognize that the Fourteenth Amendment is superior to even the Constitution of their state. They will further acknowledge the United States Supreme Court as the final arbiter of the scope of that amendment. Any other view is, in our judgment, unthinkable.

In the second place, complainants say that, even if they finally obtain relief in the state courts, they still suffer from inadequacy. It is their argument that they will suffer injury while waiting for that remedy. They claim chiefly that they will lose some comparatively small amount of interest on the disputed taxes. This argument almost gives one the impression that they insist on being hurt. It is and must be a fundamental of appellate procedure that either the court appealed from or to has the power to preserve the subject-matter of the litigation in status quo. Otherwise the right of appeal becomes a right for which not much printer's ink will be spilled. We cannot stop here to give the very interesting history of the common-law writ of audita querela and its expansion into the supersedeas. Suffice it to say that it is a remedy to prevent the abuse of the process of the courts, one of whose spheres of operation is the supercession of the judgment of an inferior court pending a determination on appeal. Furthermore, it is unnecessary to determine whether or not the writ of certiorari automatically includes suspension and/or supersedeas. This for the reason that it is quite clear that the judge allowing it (either trial or appellate) "may affix such conditions as in his judgment are necessary for the protection of the parties."

It thus is apparent that here also the adequacy of the remedy depends upon whether or not the members of our New Jersey courts will perform their duties. Again we refuse to intervene upon the assumption that they will prove unworthy of their appointment. As a matter of fact, one of the plaintiffs here has already had its suspicion disappointed by one Supreme Court justice. In similar litigation (subsequently reported, Central R. of New Jersey v. State Board of Tax Appeals, reported in 109 N. J. Law, 395, 162 A. 889) Mr. Justice Trenchard allowed the writ of certiorari upon conditions. He said:

"I allow this writ. Let it be sealed. Upon condition that prosecutor pay the tax for the year 1931 on its property used for railroad purposes in the state of New Jersey as presently levied, subject to return to it by the state of such part hereof as may be found excessive, together with interest thereon. Dated Nov. 25, 1931.
"Thomas W. Trenchard,
"Justice of the Supreme Court."

This leaves very little to the argument that the plaintiffs will lose interest on money they have been unjustly deprived of. As a matter of fact, we see no reason why the payment of the sum disputed should not be suspended entirely.

To make assurance doubly sure, however, the state obtained the passage of legislation designed to make the performance of their duties in the premises by the Supreme Court justices mandatory. This statute is to be found in chapter 10 of the Laws of New Jersey for 1933 (Comp. St. Supp. N. J. § 208—447a), and it reads as follows: "1. Upon the granting of any writ of certiorari to review any tax assessed under the act to which this act is a supplement, the court shall require that the prosecutor pay that part of said tax which is not in dispute, and if the parties are unable to agree upon the amount thereof the same shall be ascertained by the court directly or by reference to a Supreme Court commissioner, and a supersedeas shall be issued to stay the collection of the disputed portion of the tax until the final determination of the proceedings to review said tax."

We do not believe that the Supreme Court justices are any more inclined to obey or disobey settled principles of law expressed in statutes than they are those principles of law expressed in decisions of the Supreme Court of the United States. However, if the plaintiff thinks so, there is the statute.

The theory that the court of equity acts as of the time it is asked to act rather than as of the time when its action is due, seems to us Alice in Wonderland law. The adequacy of a remedy must speak as of the time it is granted and not as of the time it is solicited. We are relieved of our difficulties as they exist and not as they may have existed on some previous occasion. We can understand that it might be unfair to require a litigant to go through proceedings for a second time in another court when he has been acting on an existing situation which justified his selection of a forum. That is the ratio decidendi, we think, of the cases cited by the plaintiff. Even this hardship seems to disappear under any properly drawn Transfer of Causes Act (Comp. St. Supp. N. J. § 163—348 et seq.). It would be particularly unfair if the changed situation arose because of delay occurring after the submission of the case

to the court. In the principal case, the statutory change in the remedy at law occurred in the midst of the proceedings in equity, and before, therefore, this court was called upon to act. No testimony was required or taken; the briefs and arguments in so far as not available in the state courts cannot have required the expenditure of much effort. The statute is a simple one, and obviously affords no opportunity for conflicting constructions, and for the application of the cases cited on that point.

In conclusion let us say that we think the plaintiffs have been carried away by a habit of mind. We acquit the complainants in these various cases of judicial shopping. They can hardly suppose that the United States judges are more persuasive than state judges or that the Supreme Court justices feel that they belong to the same lodge. It has, however, become a hornbook of utility corporation law to seek out the federal courts in the first rather than in the last instance. This habit of mind, like most habits, even bad, has its explanation, if not its justification. It came to be accepted doctrine that the various state regulating boards and their supervising state courts were biased on their consideration of rate and tax cases. This bias, it came to be thought, was of a political character. We do not pass upon this truth or falsehood of this rather shocking implication. We only suggest that it has led to a general attitude which has a tendency to obscure the circumstances which govern the particular case in the particular state. Such circumstances may make a particular state the exception rather than the rule, if there be in fact such a rule. We believe that, if it had not been for the barrier created by the disposition already referred to, plaintiff's counsel would have examined with a more sympathetic eye the course of decision in the New Jersey courts. They would have realized that the Court of Appeals of New Jersey is quite capable of appreciating elementary principles of constitutional law. Having realized it, they would, we think, have been content to abide by that appreciation without seeking to make us, the lowest federal court, their master.

In conclusion, the court will indulge itself to the extent of quoting from the jurist with whose mental processes it is most familiar. In the case of U. S. v. Mayor and Council of City of Hoboken, N. J. (D. C., August 10, 1928) 29 F.(2d) 932, at page 937, we said:

"In the case of the exercise of this injunctive power by the federal courts, a further and equally serious consequence threatens. That is the ousting of the state from the consideration of the particular matter, either in its judicial or in its administrative departments, or in both. This court reiterates the views expressed three years ago in a water rate case. It might add that it feels that events which have transpired since then have only served to confirm its conviction in that regard. The theory seems to be that, since the question is one that can be carried ultimately to the highest United States court, the United States Supreme Court, it might as well be considered in the first instance by the lowest United States court, the United States District Court. This procedure, first, deprives the United States Supreme Court of the expression of the state court's views on the question, opinions which they always desire and in cases, for instance of interpretation, of statutes, actually follow (Wuchter v. Pizzutti [276 U. S. 13], 48 S. Ct. 259, 72 L. Ed. 446 [57 A. L. R. 1230]); and, second, in our opinion, it has the exceedingly harmful result of undermining the confidence of the people in the federal courts.

"It may be and is argued that federal judges are citizens of the same states and learned in the same law as the state judges, and that this feeling of the average citizen towards some of the activities of the federal courts is an unreasoning and as unreasonable as that of our ancestors toward a federal government. Nevertheless it is our humble judgment that any federal judge who has given the matter much thought senses this feeling, and understands that it is a not unnatural result of the preference for local self-government. If such judge, even after consideration, regards this view as fanciful, let him read the Debates in Congress, particularly those preceding and resulting in the passage of section 266 of the Judicial Code (28 USCA § 380), the provision taking away from a single District Judge the power to restrain the operation of state agencies, and those concerning certain legislation introduced at the present session of Congress. Courts do not exist in a vacuum, but depend, even more, in the last analysis, than the other branches of government, on the thoughtful and continued support of the governed. By the same token, those judges who believe in our federal courts will endeavor to confine their functions to those fields in which that support is ungrudgingly given. In our opinion, the original cause of the trend to-

wards expansion of the injunctive powers lay in the importance of the issues presented in the courts. Whether or not the rates of public utilities could be regulated constitutionally entirely dwarfed the question of whether or not the highest state or lowest federal court should first determine that issue. Granger Cases. To-day the minor problem has become the important and still-unsettled one."

Since that was written, it has become increasingly evident that the agitation to restrict our jurisdiction is going to be successful. Senate Report No. 530, First Session of the 72d Congress, "Limiting the Jurisdiction of District Courts"; Cornell Law Quarterly, June 28 (Professor Frankfurter); Proceedings of Fifty-Fifth Annual Meeting of the American Bar Association Journal, November, 1932, p. 756 et seq. We have previously had something to say on the general subject of restriction. We shall not repeat ourselves, but cannot refrain from quoting the words of the distinguished historian of the Supreme Court, Mr. Charles Warren, in the proceedings above cited: "Mr. Charles Warren, of Massachusetts, then took the floor. 'As I understand the resolution before the house,' he said, 'it is to put this organization on record as opposing any radical change of the present jurisdiction of the Federal Courts. Mr. Chairman, I conceive of nothing so hidebound, so unprogressive, as that proposed resolution. What is there sacrosanct about the present jurisdiction of the Federal Courts? Why, for over a hundred years there has been legislation changing the jurisdiction of the Federal Courts. Why should we at this present moment assume that there is no necessity for any radical change in that jurisdiction? It might be that this organization might choose to favor or oppose any one of these particular bills, but to lay down the broad proposition that we are opposed to any radical change of present jurisdiction seems to me to place this organization back in the Dark Ages out of touch with present conditions, out of touch with present evils, out of touch with what the Congress of the United States is there for, namely, to see whether present conditions do not demand a change in some respects. I protest for one against the passage of any such resolution as this.'"

We only suggest now that the agitation is primarily the result of resentment against the class of cases of which the principal case is typical, rather than against the federal jurisdiction generally.

The bill will be dismissed.