158

**In re NEW YORK, S. & W. R. CO.**

**No. 26175.**

District Court, D. New Jersey.

Dec. 14, 1940.

Ralph E. Lum, of Newark, N. J., for debtor and Walter Kidde, trustee.

CLARK, District Judge.

Counsel for the Trustee of the New York, Susquehanna and Western Railroad is petitioning the Court which appointed him for instructions. He desires binding advice on the part he should play in certain litigation now pending between the State of New Jersey and various railroads. His petition is filed as the result of his receipt of a rather remarkable document. That document (dated and filed December 6, 1940) is a petition addressed to the Circuit Court of Appeals for the Third Circuit. It is filed by a firm of Philadelphia lawyers. It asks for an extension of time of 30 days in which to file petition for rehearing in the case of Central Railroad Company of New Jersey v. Martin, et al., 3 Cir., 115 F.2d 968, decided November 27, 1940. It contains the following paragraph:

"The Trustees of the said Railroads in reorganization under Section 77 of the Bankruptcy Act, [11 U.S.C.A. § 205] *desiring* to join in the proposed petition to your Honorable Court for a rehearing will require the permission of the District Courts of their appointments for permission to join therein and in any other proceedings connected with the said appeals and your petitioners will require further time for the preparation of the said petition for rehearing and for securing such permission on behalf of the said Trustees." Para. 5 of the Petition (italics ours).

The curious circumstance here lies in the use of the word "desiring". That is assuredly no negative quality and so hardly capable of what might be called free hand assumption. Neither our Trustee nor his

counsel was consulted. In fact, his first knowledge of this petition came some days after its filing. As we understand it, that amount of information was only due to courtesy extended to our counsel by the solicitor for another of the railroads joining therein. We suggest that the Circuit Court of Appeals may have been deceived into granting the "enlargement of time" for rehearing.

At any rate, if our Trustee shares the "desires" of the Court that appointed him, he will have no wish to have anything to do with the exhausting litigation in the Third Circuit. We happen to have a long time familiarity with that legal marathon. In 1933, the Central Railroad (now in bankruptcy) and the Lehigh Valley Railroad sought from us an injunction against the imposition by the State of the statutory taxes.[1] The ground then was that of discriminatory, and so unconstitutional, assessment. "It is agreed", to quote from our opinion at page 477 of 3 F.Supp., "that for many years the taxing authorities of New Jersey have indulged in the amiable practice of assessing railroad property at 100 per cent. and the property of all its other citizens (sic) at 80 per cent". We dismissed the bill because we considered and consider that the railroads had mistaken their route. We thought and think that in a Federal system the method appropriate for the consideration of this type of constitutional question is through resort to the highest State Court and then by appeal to the United States Supreme Court. The railroads and other corporations have been freely criticized for their tendency to "rush into" the lower Federal Courts. In fact, that eagerness has given an impression of some hope of a greater sympathy therein and so has lessened the confidence that goes with judicial impartiality.

The Circuit Court of Appeals of that day did not approve of our position and in two months reversed us "with directions to proceed in due course". Central R. Co. of New Jersey v. Martin, 3 Cir., 65 F.2d 613, 615. It might be observed that the railroad's principal contention of refusal by the State Courts to heed the direction against discrimination given them by the United States Supreme Court was untrue in fact. We quoted from an opinion by Mr. Justice Katzenbach (surely no radical) speaking for our Supreme Court. It reads: "The purpose of this act was to prevent just such discrimination as the prosecutor complains of. There is nothing in the record which shows that the prosecutor took such action before the county board of taxation. It has refused to avail itself of the remedy afforded it by our legislation to correct the evil of which it complains. One cannot claim a deprivation of constitutional rights by ignoring the remedy provided." Hackensack Water Co. v. State Board, 104 N.J.L. 48, 50, 139 A. 410, 411. This opinion had not been cited by counsel and mirabile dictu the learned Circuit Court of Appeals used its first two sentences in support of their position and omitted the rest which was introduced by the words, "It is unnecessary to consider at length this proposition, because".[2] Furthermore, the highest court of New Jersey subsequently and on December 7, 1933, did exactly what the Circuit Court of Appeals prophesied it would not do.[3] They acknowledged the Supreme Court rule against discriminatory assessment and suggested that the railroads stop asserting it and begin proving it.

After their triumph at our expense, the Central and the Lehigh did not "proceed in due course". They indulged themselves in the old and evil American legal practice of judicial shopping. In plain violation of our venue rule[4] they proceeded in the Trenton part of our District. They found, however, that they had come to the wrong shop, for the learned District Judge dismissed their bill.[5] In these hearings they had broadened their base and attacked the taxes not only for discrimination but on all points. The Court held that they still had failed to prove the discrimination that they had so often been asked to show. It also found their proof "of error, in assessing the value of railroad property, so fundamental as to violate the due process clause" inadequate. This decision found favor with the same appellate court which had given previous heed to the railroad com-

---

[1] Central R. Co. of New Jersey v. Martin, D.C., 3 F.Supp. 477.

[2] Hackensack Water Co. v. State Board, 104 N.J.L. 48, 50, 139 A. 410, 411.

[3] Central R. Co. of New Jersey v. State Department, 112 N.J.L. 5, 169 A. 489.

[4] Rules of the District Court of the United States for the District of New Jersey (1938), General Rule 12, Term Calendars, at p. 14.

[5] Lehigh Valley R. Co. v. Martin, D.C., 19 F.Supp. 63, 70.

plaints and it was affirmed.[6] Later certiorari was refused by the Supreme Court.[7]

Nothing daunted by all these reverses, the railroads picked up themselves and their evidence and returned to the fray in Trenton. They obviously had to chose a different tax year but as there were plenty of them around this presented no great difficulty. This second case was decided on November 1, 1939,[8] and the learned District Judge ended his opinion with this statement: "The preparation of this memorandum was concluded in July of 1938. It was not filed because representatives of both sides to the litigation conceded the possibility that the New Jersey Legislature might intervene in such a manner as to make a judicial determination unnecessary." Central R. Co. of New Jersey v. Martin, D.C., 30 F.Supp. 41, 66. He found the railroads still shy on discrimination but up to the mark on "fundamental error" in valuation. So he restrained the collection of the taxes.

This time the inevitable appeal had to be taken by the State of New Jersey. It was argued on October 21, 1940, to an entirely different judicial personnel and on November 27, 1940, that learned Court disagreed with the Court below upon four grounds. We quote them in reverse order. First, they adopted our own original theory that the remedy, if any, was through the state courts; second, they found the suits were really against the State itself and so in contravention of the Eleventh Amendment; third, they said the attempt to escape res judicata by the use of another taxing year was unsound; and fourth, they expressly disapproved the railroads' contention "that the failure of the state authorities to give effect to declining earnings in making the valuations resulted in assessments so excessive as to violate the due process clause and thus to justify the injunctive relief granted by the district court."

In this last aspect they quoted from, and held themselves bound by, a very recent decision of the United States Supreme Court.[9] Inasmuch as the railroads and the learned District Judge have relied principally upon a previous decision of that august tribunal, we think it appropriate to requote what the present unanimous majority has to say about their earlier divided effort: "But even assuming that there was an over-assessment, constitutional invalidity would not follow. If the needs of a state require higher taxes, the Fourteenth Amendment certainly does not bar their imposition. The maintenance of higher assessment in the face of declining value is merely another way of achieving the same result. Great Northern Ry. Co. v. Weeks,[10] 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532, does not bar the way. That is the only case, and it was decided by a sharply divided Court, in which a non-discriminatory assessment was struck down simply because it was thought excessive. Plainly, therefore, the case must have rested upon considerations peculiar to its own facts. Those are not the facts now before us. We conclude, therefore, that the Commission's over-assessment of petitioner's property, if over-assessment there was, constitutes no deprivation of any right under the Federal Constitution." Nashville, C. and St. L. Ry. v. Browning, 310 U.S. 362, 370, 60 S.Ct. 968, 972, 84 L.Ed. 1254.

We have set forth this somewhat painful "history of a law suit" because it is what moves our present instruction to our Trustee. We insist upon a proscription of futility. These railroads have twice had the views of the Court whose mind (with the help of additional counsel) they seek to change. They have once had the judgment, by implication anyway, of the Highest Court. In that connection, we have had some doubts from the difference of quality as distinguished from detail in the

[6] Lehigh Valley R. Co. of New Jersey v. Martin, 3 Cir., 100 F.2d 139.

[7] Lehigh Valley R. Co. v. Martin, 306 U.S. 651, 59 S.Ct. 592, 83 L.Ed. 1049.

[8] Central R. Co. of New Jersey v. Martin, D.C., 30 F.Supp. 41.

[9] Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254.

[10] A case universally criticized by writers on the law, Water and Water Courses—Riparian Rights in Streams Flowing Through Several States, 35 Michigan Law Review 176; Taxation—Due Process—Validity of Excessive But Nondiscriminatory Levy and Assessment, 13 New York University Law Quarterly 628; Taxation—Due Process—Excessive Assessment, 20 Minnesota Law Review 689; Constitutional Law—Arbitrary Valuation for Tax Purposes By State Board of Equalization As A Violation of Due Process, 84 University of Pennsylvania Law Review 784; Taxation—Levy and Assessment—Non-Discriminatory Overassessment As

evidence offered in the two different District Court cases. We should not want to express more than a doubt because we have had no occasion to compare the voluminous records. It is, however, strange that competent counsel had to be prodded by defeat into putting their best evidence forward.

We do not wish, however, to end on this note of helplessness. We have before us an appeal to our conscience as a court of bankruptcy. That appeal places its plea for the reduction of taxes on grounds peculiar to those suffering from the ravages of financial disease. With the generous cooperation of the Attorney General, the State's original claim has been held suspended and awaiting events. It may now be necessary to decide it. In anticipation thereof, it may not be amiss to make some general, and we hope thought provoking, observations. In doing so, what we say is, of course, tentative.

■ In spite of what seems the plain and mandatory wording of the appropriate statute,[11] the lower Federal Courts are not in agreement[12] in their interpretation thereof. The majority,[13] and we think the better reasoned cases, concede themselves jurisdiction to review tax assessments. They maintain that they are not undertaking to revise an assessment, but are rather endeavoring to ascertain the amount of the tax which may be allowed as a claim against the debtor's estate. It is significant that included among the majority are the only two reported cases involving railroad reorganizations under Section 77, 11 U.S.C.A. § 205.[14]

On the assumption then that we have jurisdiction to revise, what should be the impelling considerations? A well-known advertising slogan might be reversed and made to read, "When more unscientific taxes are imposed, New Jersey will impose them". A comparison of her railroad taxes with those of her sister states makes this quite clear. A table abridged from an article entitled, Does New Jersey Overtax Railroads?, shows that New Jersey railroads are taxed twice as highly as those in any other state. It follows:

| State | 1931 | 1932 | 1933 | 1934 | 1935 |
|---|---|---|---|---|---|
| New Jersey | $10,256 | $10,321 | $9,136 | $9,243 | $8,998 |
| Dist. of Col. | ·4,481 | 4,515 | 4,378 | 3,775 | 3,937 |
| Rhode Island | 4,016 | 3,741 | 3,741 | 3,585 | 3,570 |
| New York | 3,550 | 3,522 | 3,522 | 3,256 | 3,039 |

Taxes per mile on Class I Railroads, Journal of Industry and Finance, July, 1937, p. 29, 30

---

A Violation of Due Process, 49 Harvard Law Review 1012.

11 "in case any question arises as to the amount or legality of any taxes, such question *shall* be heard and *determined* by the [bankruptcy] court." § 64 sub. a (4), Bankruptcy Act, 11 U.S.C.A. § 104, sub. a (4), .(italics ours).

12 There is no dispute as to the applicability of section 64, sub. a (4) to a § 77 proceeding, 11 U.S.C.A. § 205, In re New York, Ont. & W. Ry., D.C., 25 F.Supp. 709; In re Denver & R. G. W. R. R., D.C., 23 F.Supp. 298; In re Missouri Pac. R. R., D.C., 33 F.Supp. 728.

13 In re Fisher Corp., D.C., 229 F. 316; In re Thermiodyne Radio Corp., D.C., 26 F.2d 716; Henderson County v. Wilkins, 4 Cir., 43 F.2d 670; Dickinson v. Riley, 8 Cir., 86 F.2d 385; Board of Directors of St. Francis Levee Dist. v. Kurn, 8 Cir., 91 F.2d 118, certiorari denied, 302 U.S. 750, 58 S.Ct. 272, 82 L.Ed. 580;

Board of Directors of St. Francis Levee Dist. v. Kurn, 8 Cir., 98 F.2d 394; In re Lang Body Co., 6 Cir., 92 F.2d 338; In re Fuoco, D.C., 22 F.Supp. 808. Contra: In re Gould Mfg. Co., D.C., 11 F.Supp. 644; In re Schach, D.C., 17 F.Supp. 437; In re Adams Building Corp., D.C., 27 F.Supp. 247, affirmed, 7 Cir., 105 F.2d 704.; cf. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Power of Bankruptcy Court to Revise a Tax Claim, 45 Yale Law Journal 734 (note); Jurisdiction of a Federal Bankruptcy Court to Rule On State Taxes, 50 Yale Law Journal 165 (note); Kloeck, Bankruptcy-Taxes-Power of Courts to Reduce Taxes, 16 Chicago-Kent Law Review 171. Bankruptcy-Jurisdiction Over Tax Claims, 7 University of Chicago Law Review 717 (note).

14 In re Denver & R. G. W. R. R., above cited; In re Missouri Pac. R. R., above cited.

This lack of tax logic is in part due to a fundamental mistake in selection. New Jersey taxes its railroads by means of a complicated variant of the general property tax. That particular genus has been widely criticized.[15] It proceeds almost entirely on a principle of convenience. You see the property and you "sock" it. Professor Seligman, a most eminent authority on taxation, devotes a whole chapter to a criticism of that form of tax.[16] He sets forth its five principal disadvantages, lack of uniformity or inequality of assessment, lack of universality or failure to include personal property, incentive to dishonesty, regressivity or the rate increasing as the property or income decreases, double taxation, and concludes in this trenchant sentence: "If we sum up all these inherent defects, it will be no exaggeration to say that the general property tax in the United States is a dismal failure." Seligman, Essays in Taxation, p. 31. We are reminded of Walpole's famous observation: "landed gentlemen are like the flocks upon their plains, who suffer themselves to be shorn without resistance; whereas the trading part of the nation resemble the boar, who will not suffer a bristle to be pluckt from his back without making the whole parish to echo with his complaints." Sinclair, History of Public Revenue, Vol. III, Appendix p. 79.

Because, as we have said, we may ultimately have to give the question more detailed examination, we do not wish to now unduly extend any criticism of the particular species of property tax here in issue. It is quite plain, however, that to tax property "used and useful" only for the production of income without proper allowance for that income or for the lack of it is even more unfair than a similar procedure in respect to property "used and useful" rather for the comfort and enjoyment of the owners whose personal incomes are generally regarded as the source of the tax.

The ad valorem or "true value" theory of taxation is of peculiar difficulty of application to railroads and to make matters worse in New Jersey it is applied in a peculiar way. We are fortunate in having available for our assistance two thorough studies of the Railroad Tax problem by two learned Professors.[17] We think we best can emphasize our feeling and yet avoid the detail we may have later to indulge in by three quotations from their books:

"The real question presented by the New Jersey cases, therefore, is not whether the railroads in that state are being assessed at their 'true values'; for any attempt so to assess them would be ridiculous. It is rather whether the particular pseudo-valuations used by the assessors constitute a more or less desirable determinant of the railroads' tax bills than the alternative pseudo-valuations proposed by the railroads. Up to a certain point, at least, the attorneys for both sides seem to be aware of this situation. But they dare not make their awareness vocal since, by so doing, they would be attacking one of the most cherished illusions of American law—the illusion that a statute or constitution should be taken literally when it declares that property should be assessed for tax purposes at its 'true' or 'actual' value." Bonbright, p. 547.

"The field of greatest difficulty of application of the property tax includes those large property aggregates and units for which no market exists. Obviously this field includes the railroads and the other large public utility enterprises. It includes also the large factories, office buildings, blast furnaces and other equipment of the great private business corporations. To the extent that this condition has not yet been recognized by the introduction of some system of 'in lieu' taxes, it has been necessary, as a practical measure, to develop an assessment technique which is essentially artificial and unreal."

"The fictional character of the 'true value' concept presents a difficult situation for the assessing officer who must, in some way, deal with fiction as though it were fact." Lutz, p. 73

and in further discussion of the particular application by New Jersey of this unworkable and discredited theory:

"The most fundamental criticism of the

---

[15] Bonbright, Valuation of Property pp. 460–480; 1166–1198; Bonbright, May the Same Property Have Different Values for Different Purposes? Proceedings of The National Tax Ass'n (1927) pp. 279–289; Bonbright, The Valuation of Real Estate for Tax Purposes, 34 Columbia Law Review 1197; Nerlove, Valuation of Property; A Review, 6 University of Chicago Law Review 157; Luce, Assessment of Real Property for Taxation, 35 Michigan Law Review 1217.

[16] Seligman, Essays in Taxation, Chapter 2, The General Property Tax, at page 19.

[17] Bonbright, Valuation of Property; Lutz, The Taxation of Railroads in New Jersey.

New Jersey railroad valuation procedure is that it cannot possibly arrive at a defensible result. Even recognizing that in any event the assessed 'true value' is a fiction, the New Jersey result is not a convincing or realistic fiction. * * *

. "The segregation of railroad property into classes has been at the root of the difficulty. This is a superfictional approach to the problem of valuation, for it is wholly inconceivable that in any deal for a railroad property, the buyer and seller would begin by dividing the assets into the four classes established in the New Jersey law, and after setting separate market values on each, arrive at a total by adding the several class values together. None of these classes has earning power apart from the others, hence any recognition of the earnings factor is wholly out of the question. Likewise, none of the items of physical property has more than a scrap value when each item is separated from the other physical units which together constitute the operating property. Literal observance of a statutory rule which obliges the assessor to proceed by such a method leads, inevitably, to a piecemeal valuation. In no other way can a valuation of separate classes of property be determined." Lutz, pp. 113–115.

▮ If it be decided that the New Jersey system of assessment must be abandoned, what should take its place? Professor Lutz gives us the general principle: "There is no absolute criterion of a 'fair' or 'equitable' tax on a railroad. The closest practical approach to such a goal is likely to occur when the amount of such tax is determined primarily with a view to its effect upon the long-run performance, by the railroad, of its economic function of transportation." Lutz, p. 74. We suggest the very statute that empowers us to place an umbrella over this orphan of the financial storm provides the more specific slide rule. It reads:[18] "The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, pres-ent, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts." Section 77, sub. e, Bankruptcy Act, 11 U.S.C.A. § 205, sub. e.

Although the Congress was apparently worried about constitutional issues if the basis of valuation was too divergent from the preconceptions of the courts; it is also clear that it intended that capitalized earning power should be the sole direct consideration and that other factors should have relevance only in the light of their effect upon earnings.[19] The congressional fears were perhaps ill-founded, since the Supreme Court had already adopted this standard for market value. In Atlanta, B & C. R. Co. v. United States, 296 U.S. 33, 39, 56 S. Ct. 12, 15, 80 L.Ed. 25, it was held that, "clearly, the only pertinent value is that for purposes of sale or exchange. Cost of reproduction is to be given little, if any, weight in determining such value in the absence of evidence that a reasonably prudent man would purchase or undertake the construction of the properties at such a figure."[20] The Senate probably later realized that its fears were groundless, for on May 29, 1939, an amendment was passed revising and clarifying Section 77, sub. e:[21] "The Commission shall determine the value of any operating railroad property by capitalizing at a reasonable rate the expectable future average annual net railway income of the property, as determined by the Commission under subsection (d), and giving only such effect, if any, to the present cost of reproduction, either new or less depreciation, or the original cost of the property or to the actual investment therein and other factors as may be required by the Constitution of the United States in the determination of value for the particular purpose involved."

---

[18] Cf. The Valuation Act of 1913, 49 U.S.C.A. § 19a.

[19] See Bonbright, Valuation of Property, p. 879; Spaeth and Windle, Valuation of Railroads Under Section 77 of the Bankruptcy Act, 32 Illinois Law Review 517.

[20] Cf. Great Northern Ry. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532, noted in 49 Harvard Law Review 1012, 84 University of Pennsylvania Law Review 784; 30 Illinois Law Review 1070; 20 Minnesota Law Review 689; 45 Yale Law Journal 1306; 13 New York University Law Quarterly Review 628; 35 Michigan Law Review 174; 17 Taxes 139. Cf. also, City of Detroit v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833; noted in 36 Michigan Law Review 1036.

[21] Senate Bill 1869, at page 46, 84 Cong. Rec. 6233.

Let us apply this theory to the New York, Susquehanna and Western Railroad. In capitalizing its earnings, the period of 1931 to 1935 is selected because the conditions of those years closely resemble those which may be expected for the Susquehanna in the near future and because this period was available to the taxing authorities during most of the years in question. Since the Susquehanna's earnings reflect and include the traffic which originated on the W. B. & E., the cost to the debtor of procuring that business must be taken into consideration in determining the debtor's actual earnings. When the unit rule is applied[22] (97.79% of the Susquehanna's property is in New Jersey), the average net railway income for this period is $206,618. Capitalized at 5%, the current rate of return, a valuation of $4,132,360 is found. This figure is approximately half the value assessed by New Jersey taxing authorities during any one of the contested years. With any allowance that may reasonably be made for original and reproduction cost, a valuation founded primarily on earnings would be well under two-thirds the New Jersey assessments.

In conclusion, we should like to dissipate a misconception. The impression has been given (perhaps even unconsciously) that this entire litigation is a contest between the school children of the State and the bondholders of the various railroads. So the choice has seemed one between keeping children ignorant and keeping rentiers rich, between copybooks and coupons. Fortunately this is far from the fact. Professor Lutz effectually destroys the illusion and concludes his discussion by saying: "Obviously, failure to receive from the railroad tax an amount constituting, over seven years, only 1.8 per cent of all taxes levied locally for school purposes has not in any degree jeopardized the state school system, nor would the failure to receive this small proportion of the total school revenues in the future have any such dire consequence." Lutz, p. 57

The real controversy is quite otherwise. It is in substance, between certain municipalities in Hudson County and the people (mostly of New Jersey) who invest in, ride on, ship on, and work for the railroads. We say this in no spirit of criticism of those municipalities or their governing authorities. The blame, if that be the correct word, lies with, first, the geographical accident that Hudson County is a terminal area; second, the classification theory of the statute impinging upon that geographical accident and upon the terminal properties thereby created; and third, from the extreme subdivision of all New Jersey urban territory into separate municipalities.[23] To quote Professor Lutz once more: "It follows that the withholding of a portion of the Class II railroad tax is not a statewide problem. It is not even a problem of the New Jersey municipalities, taken as a whole. It is primarily and essentially a problem of five municipalities, all of which are located in one county. It is therefore an extremely localized situation, which can have little or no fiscal significance for the great mass of New Jersey taxpayers. By the same token, the terms of any settlement or compromise of the unpaid taxes can be materially important only within an extremely limited area, and this is equally true of any changes or adjustments that may be made in the law looking toward a more satisfactory method of railway taxation." Lutz, pp. 60, 61

It is apparent that any final solution of the problem must contemplate some fundamental revision of the tax structure now existing in those municipalities. The people of Hudson County need their governmental services. On the other hand, the people of New Jersey need their trains. We suggest a sympathetic consideration of both needs.

An appropriate order has been entered.

---

[22] For detailed discussion of this rule, see Nat'l Tax Ass'n Proceedings (1937) pp. 233–301; Isaacs, The Unit Rule, 35 Yale Law Journal 838. See, also, Nashville, Chat. & St. L. Ry. Co. v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254.

[23] The Commission to Investigate County and Municipal Taxation and Expenditures, Report No. 1, The Organization, Functions and Expenditures of Local Government in New Jersey (1931).