**LEHIGH VALLEY R. CO. OF NEW JERSEY et al. v. MARTIN, State Tax Com'r of State of New Jersey et al.**

**CENTRAL R. CO. OF NEW JERSEY v. SAME.**

Nos. 4537, 4538 (1932).

District Court, D. New Jersey.

Dec. 14, 1936.

64

Maximilian M. Stallman, of Newark, N. J., and Robert J. Bain, of Jersey City, N. J. (A. H. Elder, of New York City, of counsel), for plaintiffs.

David T. Wilentz, of Trenton, N. J., and Duane E. Minard, of Newark, N. J. (John J. Solan, of Trenton, N. J., of counsel), for defendants.

FORMAN, District Judge.

These cases are here on final hearing for a permanent injunction to enjoin the State Taxing Commissioner, the Comptroller, the Treasurer, and the Attorney General of the state of New Jersey, from collecting or enforcing certain taxes levied under the Railroad Tax Act of New Jersey (P.L.1888, c. 208, p. 269 [4 Comp. St.N.J.1910, p. 5260, § 445 et seq.]) as amended and supplemented, for the year 1932 (Comp.St.Supps.N.J. § 208—445 et seq.) on the property of the Lehigh Valley Railroad Company and the Central Railroad Company of New Jersey.

The plaintiff railroads own or lease and operate interstate systems of transportation that lie partly in New Jersey.

These suits are the first of a series of actions similar in nature brought by these and other plaintiffs against the same defendants concerning taxes alleged to be due in each succeeding year following 1932, up to and including 1935. We will deal here with the suits involving the year 1932 only.

The parties have stipulated that the 1932 cases shall be determined on the record which was made at the hearing before the State Board of Tax Appeals of New Jersey and reviewed by the Supreme Court of New Jersey in the cases concerning taxes for the year 1933. The parties stipulated further that this court should determine all questions of the admissibility and competency of the evidence offered in the record before the State Board of Tax Appeals. (See stipulation on file dated February 1, 1935.)

The Constitution of New Jersey (art. 4, § 7, par. 12) requires that "property shall be assessed for taxes under general laws, and by uniform rules, according to its true value."

Section 1 of the Railroad Tax Act provides: "That all the property of any railroad or canal company not used for railroad or canal purposes shall be assessed and taxed by the same assessors and in the same manner and at the same rate as the taxable property of other owners in the same municipal division or taxing district; all other property of any railroad or canal company shall be assessed and taxed as hereinafter directed; the tax imposed by this act shall be in lieu of all other taxation upon the property subject to taxation under the provi-

sions of this act; in all cases where the real estate, tangible personal property and franchise of any company are assessed and taxed under this act, the shares of stock and the bonds and certificates of indebtedness of such company shall not be taxed in the hands of the shareholders, bondholders or creditors, except as hereinafter provided. (P.L.1888, p. 269.)". 4 Comp.St.N.J.1910, p. 5260, § 445.

Section 3 provides:

"That it shall be the duty of the board of assessors to * * * proceed to ascertain the true value of all property used for railroad or canal purposes of each railroad and of each canal company in this state, including its franchises, and they shall, in such ascertainment, ascertain:

"I. The length and value of the main stem of each railroad, and of the waterway of each canal and the length of such main stem and water-way in each taxing district;

"II. The value of the other real estate used for railroad or canal purposes in each taxing district in this state, including the roadbed (other than main stem), water-ways, reservoirs, tracks, buildings, water tanks, water works, riparian rights, docks, wharves and piers, and all other real estate, except lands not used for railroad or canal purposes;

"III. The value of all the tangible personal property of each railroad and of each canal company;

"IV. The value of the remaining property, including the franchise." 4 Comp. St.1910, p. 5264, § 447.

The principal contentions of the railroads are that their properties have been excessively valued by the use of improper principles which result in the denial of due process and subject interstate commerce to an undue burden, and that they have been discriminated against in that their properties have been assessed on the basis of full valuation while other property in the state is assessed at less than full valuation and results in the denial of equal protection of the law.

On the other hand, the defendants deny these contentions and further contend that these suits should have been presented to a court consisting of three judges, constituted under section 266 of the Judicial Code (28 U.S.C.A. § 380), and that an injunction granted in these suits would violate section 265 of the Judicial Code (28 U.S.C.A. § 379), for the reason that it would, in effect, restrain judicial proceedings of a state court.

The problems of taxation here are of vital consequence to the state and the several railroads involved. The railroads have naturally been an important source of revenue for the state, since they represent such considerable investments.

For the purpose of taxation the properties of the railroads are classified in the Railroad Tax Act of New Jersey as main stem, other real property, personal property and remaining property including the franchise.

Briefly, the lands on which the railroads operate are divided into parcels corresponding to the municipalities in which they are located, and each parcel is assessed on the basis of the valuation of contiguous lands for whatever purpose used; structures are assessed on the basis of the cost of reproduction less depreciation; personal property, such as engines, cars, machinery, is assessed on the basis of its physical condition, marine property being assessed on the basis of being in the state one-half of the time; and the franchise is apparently assessed without the application of formulæ but at a figure which represents the judgment of the State Tax Commissioner. The aggregate of the four classes is the system value or, more properly, unit value, in New Jersey. The financial reports which are required by law are considered collaterally. (See record pages 70, 97, et cetera.)

The assessments made and the taxes levied for 1932 involved in these cases were reviewed on appeal by the State Board of Tax Appeals, which entered judgments against the railroads and for the state.

In the 1932 cases, the railroads involved filed bills of complaint in the District Court for the District of New Jersey. The cases came on before a court of three judges on an application for a temporary injunction, and the court held that it had no jurisdiction, as required by section 266 of the Judicial Code, 28 U.S.C.A. § 380. (See order filed January 25, 1933.)

Thereupon the cases came on before a single judge, who granted motions to dismiss the bills of complaint. Central R.

Co. of New Jersey v. Martin (D.C.) 3 F.Supp. 477. On appeal to the United States Circuit Court of Appeals for the Third Circuit, the decrees dismissing the bills of complaint were reversed and temporary injunctions granted. Central R. Co. of New Jersey v. Martin (C.C.A.) 65 F.(2d) 613.

The methods used in assessing railroad taxes in the state of New Jersey have been in effect for approximately fifty 'years. During that period of time the railroads have brought over one hundred suits attacking the laws under which the taxes are assessed. It appears, however, that for the first time in this series of cases the railroads have brought suits in which they contend that the methods of assessment used by the taxing authorities of the state violate the due process of law and the equal protection of the law clauses of the Fourteenth Amendment of the Constitution of the United States. Heretofore, the railroads have not questioned the methods by which the taxes have been assessed, and in the 1933 cases the Supreme Court of the state of New Jersey upheld the. methods used by the State Tax Commission in fixing the valuation of railroad properties. Central R. Co. of New Jersey v. Thayer Martin, 114 N.J.Law, 69, 175 A. 637. Those cases came before the Supreme Court to review the determination or judgment of the State Board of Tax Appeals, which upheld the assessments made by the State Tax Commission. The Supreme Court dismissed the writs of certiorari. "Thus, notwithstanding that this contest has been waging for almost fifty years, and that almost every possible phase of this litigious question has been brought to our courts (it is estimated that it has been so brought in excess of 100 times) and received their consideration, it is not at all surprising that the prosecutors should, at this late stage of the contest, challenge the method employed, and so firmly established ·in the making of these assessments." 114 N.J.Law, 69, at page 73 et seq., 175 A. 637, 639.

Defendants at the outset contend that this court, sitting as a single judge, has no jurisdiction over the issues herein involved. This is a repetition of their contention heretofore made before the three-judge court assembled upon their first application. They submit that the action of the State Board of Tax Appeals is tan-tamount to an administrative order and that as such the same cannot be· restrained except in accordance with Section 266 of the Judicial Code (28 U.S.C.A., § 380). This section provides that "No interlocutory injunction suspending or restraining the enforcement, operation, or execution of any statute of a State by restraining the action of any officer of such State in the enforcement or execution of such statute, or in the enforcement or execution of an order made by an administrative board or commission acting under and pursuant to the statutes of such State, shall be issued * * * by any district court of the United States, or by any judge thereof, * * * upon the ground of the unconstitutionality of such statute, unless the application for the same * * *, shall be heard and determined by three judges."

Prior to July 1, 1931, the power to assess the value of railroad property for the purpose of taxation and to review the assessments was placed in the State Board of Taxes and Assessment. The action of the Board was reviewable by certiorari. P.L.1888, p. 269, as amended. It was abolished and the State Tax Department and the State Board of Tax Appeals were established. It was provided that the latter Board should succeed to the power of the State Board of Taxes and Assessment to review appeals concerning assessments, collections, etc., of taxes. The State Tax Commissioner, as chief officer of the State Tax Department, succeeded to all the duties of the old Board except that of review. P.L.1931, cc. 100, 101 and 336, pp. 166, 170 and 823; N.J. St.Annual 1931, § 208—66d (705) et seq., § 208—37a· (19) and § 208—37a (20) et seq.

Section 10 (P.L.1931, p. 166 at p. 169; N.J.St.Annual 1931, § 208—66d (714) empowers the Board "to review, hear· and determine all appeals * * * and to make such orders upon the final determination of such appeals as will effectuate said final determination according to· law."

The State Tax Commissioner is required to certify to the Comptroller of New Jersey the valuation of all railroad property. Unless the assessments are reviewed, the certificate of assessment is conclusive and has "the force and effect of a judgment of a court of record having competent jurisdiction." On written com-

plaint and notice either the railroads, the Attorney General, or the local taxing authorities, as to second-class property, may appeal to the Board of Tax Appeals on the ground of illegal discrimination in the assessment or levy of the tax; and if such shall appear the Board shall correct, adjust, and equalize the assessment and tax. The Board then certifies its final determination to the State Tax Commissioner, who must forthwith certify any changes to the Comptroller.

. The "final determination" of the Board may be contested by certiorari to the Supreme Court. If it appears that the final determination of the Board is illegal, excessive, insufficient, or discriminatory the court may correct, adjust, or equalize such "assessment and tax," or refer it back to the State Tax Commissioner so to do.

If any tax remains unpaid ten days after it becomes due, the Attorney General is required to apply to a Justice of the Supreme Court for an order that the "tax" shall be of record in the Supreme Court and judgment entered in the name of the state against the railroad. The order is made on a certified copy of the certificate and report of the State Tax Commissioner from the Comptroller. The Attorney General is required to apply also for an order that execution shall issue on the "said judgment." Application for the order requires notice but the proceeding is summary.

The question of whether an assessment by a board similar to that of the State Board of Tax Appeals is an order of an administrative body has been decided by the United States Supreme Court in the case of Ex parte Williams, 277 U. S. 267, 48 S.Ct. 523, 72 L.Ed. 877. The following is the language used:

"A case does not fall within section 266 [28 U.S.C.A. § 380], unless a statute or an order of an administrative board or commission is challenged as contrary to the Federal Constitution. Oklahoma Gas Co. v. Russell, 261 U.S. 290, 43 S. Ct. 353, 67 L.Ed. 659; Ex parte Buder, 271 U.S. 461, 465, 46 S.Ct. 557, 70 L.Ed. 1036. Here, there was no question as to the validity of the taxing statute. It.was the assessment which the railroad challenged. And an assessment is not an order made by an administrative board or commission, within the meaning of that section. The function of an assessing board is not that of issuing orders. Its function is informational. Its duty is to make findings of fact, and thereby furnish the basis on which other officials are to act in individual instances in levying and collecting the taxes. An assessment does not command the taxpayer to do, or to refrain from doing anything; does not grant or withhold any privilege, authority, or license; does not extend or abridge any power or facility; does not determine any right or obligation. Compare Standard Computing Scale Co. v. Farrell, 249 U.S. 571, 577, 39 S.Ct. 380, 63 L.Ed. 780; Pennsylvania R. R. Co. v. United States Railroad Labor Board, 261 U.S. 72, 43 S.Ct. 278, 67 L.Ed. 536; United States v. Los Angeles & Salt Lake R. R. Co., 273 U.S. 299, 310, 47 S.Ct. 413, 71 L.Ed. 651; Southern Bell Telephone & Telegraph Co. v. Railroad Commission (D.C.) 280 F. 901. An assessment is directed by one officer of the state to another. Compare Great Northern Ry. Co. v. United States, 277 U.S. 172, 48 S.Ct. 466, 72 L.Ed. 838. Though in Nebraska the railroad property is, in the main, assessed by a state board and the value of the part within each county is then determined on a pro rata basis, the function of assessing property within a county remains the same as it would be if the valuation of all the property were made by a county board. Whatever the scope of the jurisdiction of the assessing body and whatever the method of valuation pursued, the function to be performed remains simply that of fact finding.

"For the purpose of jurisdiction in federal courts, the difference between the function of regulating, expressed in orders of a railroad or like commission, and the function of fact finding is vital. Determinations of an administrative board which are merely findings of fact are not reviewable, Keller v. Potomac Electric Co., 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731. Assessments become reviewable judicially only when they are translated into action, as by levy of the tax based on the assessment. From this difference between regulatory orders of administrative boards or commissions, which constitute action, compare Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S. Ct. 67, 53 L.Ed. 150, and assessments by tax commissions or local assessors, which form merely a basis for action, flows the difference in the method of review in

cases brought here under section 237 of the Judicial Code (28 U.S.C.A. § 344). A judgment of a state court sustaining the validity of a regulatory order of a public utilities board is reviewable by writ of error, like a judgment sustaining the validity of a statute. Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U.S. 679, 683, 43 S. Ct. 675, 67 L.Ed. 1176; Northern Pacific Ry. Co. v. Department of Public Works, 268 U.S. 39, 42, 45 S.Ct. 412, 69 L.Ed. 836; Live Oak Water Users' Association v. Railroad Commission, 269 U.S. 354, 356, 46 S.Ct. 149, 70 L.Ed. 305; Sultan Ry. & Timber Co. v. Department of Labor and Industries, 277 U.S. 135, 48 S.Ct. 505, 72 L.Ed. 820. But a judgment of a state court sustaining a tax alleged to be illegal because there has been discrimination in assessing property, can be reviewed only on certiorari. Jett Bros. Distilling Co. v. City of Carrollton, 252 U.S. 1, 5, 40 S.Ct. 255, 64 L.Ed. 421. This is true whether it was the determination of a state or local assessing body, or, as in the case at bar, of both combined, which is alleged to have produced the discrimination. Baker v. Druesedow, 263 U.S. 137, 44 S.Ct. 40, 68 L.Ed. 212.

"Obviously an assessment which is not 'a statute of or an authority exercised under any state,' within the meaning of section 237, before amended by the act of 1925, cannot be a statute or an order of an administrative board or commission under section 266. The orders contemplated by section 266 are directed to railroads or others, of whom action, or nonaction, is commanded, as it is by a statute. Compare Sultan Ry. & Timber Co. v. Department of Labor and Industries, 277 U.S. 135, 48 S.Ct. 505, 72 L.Ed. 820. Since an assessment by a state board of equalization has none of the qualities that would be associated with 'orders,' it cannot have been the sort of state administrative function which Congress had in mind when by the amendment of 1913, it declared the scope of section 266, so as to include suits in which the injunction was sought on the ground of the unconstitutionality of an administrative order." 277 U.S. 267, at page 271 et seq., 48 S. Ct. 523, 525, 72 L.Ed. 877.

■ Here as there the action of the State Board of Tax Appeals is simply an assessment and has "none of the qualities that would be associated with 'orders' "

contemplated by section 266 of the Judicial Code (28 U.S.C.A. § 380) supra. It therefore appears that the order of the statutory court originally convened in these cases, by which it was held that the issues should be tried by a single judge, was proper and should not now be disturbed.

■ Defendants further submit that any injunction granted by this court is violative of section 265 of the Judicial Code (28 U.S.C.A. § 379). That section provides as follows: "The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

In these cases the action terminated with the dismissal of the appeals by the State Board of Tax Appeals.

The hearings before the State Board of Tax Appeals did not constitute "proceedings in any court of a State" as contemplated by the federal statute involved. The line of demarcation between administrative proceedings and judicial proceedings as contemplated by the statute is definitely drawn in the recent cases of City Bank Farmers' Trust Company v. Schnader, 291 U.S. 24, 54 S.Ct. 259, 78 L.Ed. 628, and Hill v. Martin, 296 U.S. 393, 56 S.Ct. 278, 80 L.Ed. 293.

For a further discussion of this topic see opinion in Central Railroad Company of New Jersey v. J. H. Thayer Martin, State Tax Commissioner, et al. (1933 Tax Cases), and six other cases filed on even date herewith. (D.C.) 19 F.Supp. 82.

The railroads contend that the evidence establishes beyond a doubt, and indeed that the fact is so notorious as to entitle the court to take judicial notice, that while the property of railroads is intentionally assessed at its full and true value, other property throughout the state is assessed at considerably less than true value as is required by the Constitution of New Jersey.

■ It is well settled that the federal courts will relieve against such discrimination as is alleged in these cases, even if the State Constitution requires all property to be assessed at true value; but only if a clear case of intentional and systematic undervaluation is made.

In Sunday Lake Iron Co. v. Wakefield Tp., 247 U.S. 350, 38 S.Ct. 495, 62 L.Ed. 1154, the Supreme Court said: "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property. Raymond v. Chicago Union Traction Co., 207 U.S. 20, 35, 37, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann.Cas. 757. It is also clear that mere errors of judgment by officials will not support a claim of discrimination. There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity. The good faith of such officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party. Head Money Cases, 112 U.S. 580, 595, 5 S.Ct. 247, 28 L.Ed. 798; Pittsburg, etc., Ry. Co. v. Backus, 154 U.S. 421, 435, 14 S.Ct. 1114, 38 L.Ed. 1031; Maish v. Arizona, 164 U.S. 599, 611, 17 S.Ct. 193, 41 L.Ed. 567; Adams Express Co. v. Ohio State Auditor, 165 U.S. 194, 229, 17 S.Ct. 305, 41 L.Ed. 683; New York ex rel. New York Clearing House Bldg. Co. v. Barker, 179 U.S. 279, 284, 285, 21 S.Ct. 121, 45 L.Ed. 190; Coulter v. Louisville & Nashville R. R. Co., 196 U.S. 599, 608, 25 S.Ct. 342, 49 L.Ed. 615; Chicago, Burlington & Quincy Ry. Co. v. Babcock, 204 U.S. 585, 597, 27 S.Ct. 326, 51 L.Ed. 636." 247 U.S. 350, at pages 352 and 353, 38 S.Ct. 495, 62 L.Ed. 1154.

Likewise, the court said in Southern Railway Co. v. Watts, 260 U.S. 519, 526, 43 S.Ct. 192, 195, 67 L.Ed. 375: "The rule is well settled that a taxpayer, although assessed on not more than full value, may be unlawfully discriminated against by undervaluation of property of the same class belonging to others. Raymond v. Chicago Union Traction Co., 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann. Cas. 757. This may be true, although the discrimination is practiced through the action of different officials. Greene v. Louisville & Interurban R. R. Co., 244 U.S. 499, 37 S.Ct. 673, 61 L.Ed. 1280, Ann.Cas.1917E, 88. But, unless it is shown that the undervaluation was intentional and systematic, unequal assessment will not be held to violate the equality clause. Sunday Lake Iron Co. v. Wakefield Tp., 247 U.S. 350, 353, 38 S.Ct. 495, 62 L.Ed. 1154; Chicago, Burlington & Quincy Ry. Co. v. Babcock, 204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636; Coulter v. Louisville & Nashville R. R. Co., 196 U. S. 599, 25 S.Ct. 342, 49 L.Ed. 615; Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 [28 A.L.R. 979]."

The principle asserted here by the railroads is clear enough. But there is no evidence that the local assessors were intentionally and systematically valuing property at less than its true value. At the best the railroads have shown that the assessments of nonrailroad properties are unequal in the several counties of the state.

Central Railroad Company v. Martin, 65 F.(2d) 613 (C.C.A.3) is not binding. That case came before the Circuit Court of Appeals on an application for preliminary injunction to restrain the state authorities from collecting the remainder of the railroad taxes due for the year 1932. The application was supported by ex parte affidavits submitted by the railroads. The affidavits were not even controverted by opposing affidavits from the state authorities. Thus, the court had only to decide the question of law of whether or not the averments in the affidavits showed discrimination in assessing railroad property at true value and intentionally and systematically valuing other property at less than true value. This, the averments clearly did.

It appears to be commonly supposed that the practice in New Jersey is to assess nonrailroad property at less than its true value. This has been recognized by the state in its several departments and some efforts made to remedy the condition. Several acts have been passed by the Legislature to equalize the assessment ratio in the subdivisions of the State. P. L.1905, p. 123 (4 Comp.St.N.J.1910, p. 5110, § 37a); P.L.1921, c. 350, p. 952 (Comp.St.Supp.N.J.1924, § 208—37f); P. L.1923, c. 98, p. 188 (Comp.St.Supp.N.J. 1924, § 208—37f (1). The agent of the State Board of Taxes and Assessment

estimated that the assessments were from 35 per cent. to 60 per cent. of true value. His report was rejected as evidence and he was not permitted to testify as to his findings by the Board of Tax Appeals, on the ground that his records were hearsay.

The State Board of Taxes and Assessment recognized the existence of the condition in their annual report required by law. In 1928 the Board reported that "This investigation has disclosed that an apparent percentage of assessed to true value ranging from thirty-five percent to sixty percent has been found in the twenty-one counties when the same test has been impartially applied to all." (Report of 1928, p. 11.)

From the reports of the Board of Taxes and Assessment up to 1932 these conditions were being slowly corrected. In 1934 the Legislature passed an act requiring the State Tax Commissioner and the County Boards of Taxation to determine the percentage of full value at which property is assessed. P.L.1934, c. 191, p. 465, N.J.St.Annual 1934, § 208—66d (404) et seq.

At the hearing before the State Board of Tax Appeals the railroads brought on some thirty-eight witnesses who compositely testified that in their opinions in the years 1929 to 1932 property was considerably underassessed in each of the twenty-one counties of the state. They testified that the ratio of assessed to true value averaged in the several counties approximately 50, 53, 57, and 70 per cent. respectively in those years.

Defendants offered a number of expert witnesses to rebut this testimony but in the case of seven counties no testimony was given. In no instance did the defendants' witnesses give an opinion as to the ratio of assessed to true value throughout the county. The witnesses admitted that in at least ten other counties the rural districts were underassessed. They testified that in a few cities or larger towns the assessments were at true value or over. Their evidence, where assessments were stated to be at true value, was based on certain of the sales of real estate of which the witnesses had knowledge. In a considerable number of cases even those picked sales tended to show underassessments.

The president member of the State Board of Tax Appeals in his opinion (record p. 43, at p. 55) dissented from the majority opinion and went so far as to state: "that there is conclusive evidence of undervaluation of rural property assessed under the General Tax Act as of October 1, 1932, in all taxing districts of the State with few exceptions where proof was offered."

However, the Supreme Court of New Jersey disagreed with the minority of the Board of Tax Appeals and, relying on the opinion of the Court of Errors and Appeals in Central Railroad of New Jersey v. State Tax Department, 112 N.J. Law, 5, 8, 169 A. 489, held that the proofs did not support the contention of discrimination in the valuation of railroad property.

The Supreme Court of the United States denied certiorari to review the decision of the Court of Errors and Appeals. 293 U.S. 568, 55 S.Ct. 79, 79 L. Ed. 667. In that case, the evidence submitted by the railroad for taxes involving the year 1931 was substantially the same as that before this court for the taxes involving the year 1932.

It seems that the court can no more rely on the proof submitted by the railroads than that offered by the taxing authorities to the effect that nonrailroad property is taxed at more than true value because so many thousands of appeals were successfully submitted to the County Boards of Tax Appeals in each of the years preceding these cases. The mass of the testimony is not evidence and only leads to confusion after any attempt to draw a conclusion from it. At the best, it only permits suspicions on which the court has no right to comment and certainly not to rely.

The crux of these cases is whether or not the methods used in assessing the value of railroad property are so fundamentally erroneous as to violate the due process clause of the Fourteenth Amendment of the Constitution of the United States or place an undue burden on interstate commerce.

The Railroad Tax Act does not provide for specific methods of assessing railroad property. Section 3 of the act provides that the true value of all property used for railroad purposes shall be as-

certained, and shall be ascertained separately, in the following classes (P.L.1884, p. 143 [reenacted, P.L.1888, p. 270, 4 Comp.St.N.J.1910, p. 5264, § 447]): (1) Main stem; (2) other lands and structures; (3) tangible personalty; (4) remaining property including the franchise. The act requires the railroad to furnish certain information to the taxing authorities concerning its stock, the market value thereof and its indebtednesses. The method by which true value is determined is left to the discretion of the State Tax Commissioner. There are no questions involved as to methods of assessments used by the defendants.

The testimony of Mr. Louis Focht, Chief Engineer of the Division of Railroad Valuations and Taxes of the State Tax Department, who has been attached to the Department and its predecessors since 1898, and under whose supervision assessments of the railroad properties have been made, is uncontradicted. It is evident from his testimony that the main stem lands or the right of way outside of yards and other lands including yards are valued on the basis of the valuation of contiguous lands, no matter for what purposes they may be used; that structures on both the main stem and other lands are valued on the basis of cost of

sis of the Department's judgment of the worth of the privilege to do business in New Jersey, after collaterally considering other factors such as earnings and stock and bond values.

The taxing authorities make no effort to consider the system value of the interstate railroads. The physical valuation of the property is made only on the railroad property within the state of New Jersey.

On the other hand, the railroads have offered a considerable mass of statistics from which they attempt to show the system value of the several railroads, using the stock and bond method and the capitalization of earnings method, to show the valuation of the particular railroad system as a unit, and by the use of several factors have attempted to allocate the portion of the system value to which they contend New Jersey is entitled. They insist that only by the use of the combination of the factors that they have proposed can the true value of railroad properties of New Jersey be ascertained, and that in ascertaining true value physical valuations can have no place.

The following table shows a summary of the valuations which the railroads propose:

| Line | Item | Lehigh Valley | C. R. R. N. J. |
|---|---|---|---|
| (1) | Assessment for 1933 | 45,637,628 | 102,351,077 |
| (2) | Tax for 1933 | 1,712,173 | 3,842,726 |
| (3) | Rate (1933) (2) ÷ (1) | 3.75 | 3.754 |
| (4) | Average Income 1922–31 | 1,902,942 | 5,993,752 |
| (5) | Ratio of taxation to average income (2) ÷ (4) | 90% | 64% |
| (6) | Capital charge | 6.00 | 6.00 |
| (7) | Tax rate (1933) (3) | 3.75 | 3.754 |
| (8) | Total charges on income | 9.75 | 9.754 |
| (9) | Capitalized average income (4) ÷ (8) | 19,520,000 | 61,450,000 |
| (10) | System stock and bond value | 195,179,800 | 122,227,202 |
| (11) | New Jersey proportion | 16.30% | 50.68% |
| (12) | amount | 31,814,300 | 61,944,748 |
| (13) | Average of Income (9) and Securities (12) values | 25,667,150 | 61,397,628 |
| (14) | Assessed at (1) | 45,637,628 | 102,351,077 |

reproduction less depreciation; that tangible personal property, such as rolling stock and equipment, is valued on the basis of cost of reproduction less depreciation, and that the franchise was valued on the ba-

(It will be noted that these figures represent 1933 valuations but under a stipulation are to be used in these cases.)

In the allocation of the proportion of system valuation to New Jersey, the rail-

roads suggest the consideration of the following factors:

1. Road miles (main line and branches).
2. All track miles.
3. Freight car miles. ⎫
4. Passenger car miles. ⎬ Car miles
5. Freight train miles. ⎫
6. Passenger train miles. ⎬ Train miles
7. Locomotive miles.
8. Gross ton miles. (Revenue ton miles).

In determining allocation they propose taking the mean percentage of the sum of those factors; to then apply the percentage reached to the mean of the sum of the system value according to the stock and bond method and the capitalization of earning method and thus obtain the proportion of system value assignable to New Jersey. In disposing of the contention that the New Jersey method of valuation violates the due process clause of the Fourteenth Amendment and imposes undue burden on interstate commerce the court must decide whether or not physical valuations may properly be considered as a factor in assessing railroad property, and whether or not the railroads have shown by their evidence that the use of this method by the New Jersey taxing authorities has resulted in an injury to them.

It is important that the general principles applicable in the valuation of property for the purpose of taxation be considered. The limitations of the court should be clearly understood.

The railroads are resorting to the federal court for the reason that they contend that the methods of valuation used by the taxing authorities of New Jersey violate the due process clause of the Fourteenth Amendment of the Constitution of the United States. The federal court cannot and ought not sit in judgment of the taxing authorities, and certainly not the courts of the state of New Jersey. The court's power is rightly limited to a determination of whether the taxes assessed by the state of New Jersey violate the principles of due process as guaranteed by the Constitution. That is not a power commensurate with relief that might properly be granted by a state court in an appeal by the taxpayers through the ordinary processes of law. It must be plain that its exercise is more sparing and unusual and can only be invoked in rare instances.

The principle is clearly stated in Magnano Co. v. Hamilton, 292 U.S. 40, 44, 54 S.Ct. 599, 601, 78 L.Ed. 1109: "Except in rare and special instances, the due process of law clause contained in the Fifth Amendment is not a limitation upon the taxing power conferred upon Congress by the Constitution. Brushaber v. Union Pac. R. Co., 240 U.S. 1, 24, 36 S. Ct. 236, 60 L.Ed. 493 [L.R.A.1917D, 414, Ann.Cas.1917B, 713]. And no reason exists for applying a different rule against a state in the case of the Fourteenth Amendment. French v. Barber Asphalt Paving Co., 181 U.S. 324, 329, 21 S.Ct. 625, 45 L.Ed. 879; Heiner v. Donnan, 285 U.S. 312, 326, 52 S.Ct. 358, 76 L.Ed. 772. That clause is applicable to a taxing statute such as the one here assailed only if the act be so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property. Compare McCulloch v. Maryland, 4 Wheat. 316, 423, 4 L.Ed. 579; Child Labor Tax Case, 259 U.S. 20, 37 et seq., 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432; McCray v. United States, 195 U.S. 27, 60, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561; Brushaber v. Union Pac. R. Co., supra, 240 U.S. [1] 24, 25, 36 S. Ct. 236, 60 L.Ed. 493, L.R.A.1917D, 414, Ann.Cas.1917B, 713; Henderson Bridge Co. v. Henderson City, 173 U.S. 592, 614, 615, 19 S.Ct. 553, 43 L.Ed. 823; Nichols v. Coolidge, 274 U.S. 531, 542, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081. Collateral purposes or motives of a Legislature in levying a tax of a kind within the reach of its lawful power are matters beyond the scope of judicial inquiry. McCray v. United States, supra, 195 U.S. [27] 56–59, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561. Nor may a tax within the lawful power of a state be judicially stricken down under the due process clause simply because its enforcement may or will result in restricting or even destroying particular occupations or businesses (Citizens' Sav. & Loan Association v. Topeka, 20 Wall. 655, 663, 664, 22 L.Ed. 455; McCray v. United States, supra, 195 U.S. [27] 56–58, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561, and authorities cited; Alaska Fish Co. v. Smith, 255 U.S. 44, 48, 49, 41 S.Ct. 219, 65 L.Ed. 489; Child Labor Tax Case, supra, 259 U.S. [20] 38, 40–43,

42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432), unless, indeed, as already indicated, its necessary interpretation and effect be such as plainly to demonstrate that the form of taxation was' adopted as a mere disguise, under which there was exercised, in reality, another and different power denied by the Federal Constitution to the state."

In San Diego Land Company v. National City, 174 U.S. 739, 754, 19 S.Ct. 804, 43 L.Ed. 1154:

"But it should also, be remembered that the judiciary ought not to interfere with the collection of rates established under legislative sanction, unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property. for public use without such compensation, as, under all the circumstances, is just, both to the owner and to the public; that is, judicial interference should never occur, unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property, under the guise of regulations; as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for the public use. Chicago & Grand Trunk Railway Co. v. Wellman, 143 U.S. 339, 344, 12 S.Ct. 400 [36 L.Ed. 176]; Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362, 399, 14 S.Ct. 1047 [38 L.Ed. 1014]; Smyth v. Ames, above cited [169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819]. See, also, Henderson Bridge Co. v. Henderson City, 173 U.S. 592, 614, 615, 19. S.Ct. 553 [43 L.Ed. 823].

"In view of these principles, can it be said that the rates in question are so unreasonable as to call for judicial interference in behalf of the appellant? Such a question is always an embarrassing one to a judicial tribunal, because it is 'primarily for the determination of the legislature or of some public agency designated by it. But when it is alleged that a state enactment invades or destroys rights secured by the constitution of the United States, a judicial question arises, and the courts, federal and state, must meet the issue, taking care always not to entrench upon the authority belonging to a different department, nor to disregard a statute, unless it be unmistakably repugnant to the fundamental law." 174 U.S. 739, 754, 19 S.Ct. 804, 810, 43 L.Ed. 1154.

What the Supreme Court said recently in Great Northern Railway Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532, is applicable equally to this case: "In determining the amount of the assessment, the board was not bound by any formula, rule, or method, but for guidance to right judgment it was free to consider all pertinent facts, estimates, and forecasts and to give to them such weight as reasonably they might be deemed to have. Courts decline to disturb assessments for taxation unless shown clearly to transgress reasonable limits. Overvaluation is not of itself sufficient to warrant injunction against any part of the taxes based on the challenged assessment; mere error of judgment is not enough; there must be something that in legal effect is the equivalent of intention or fraudulent purpose to overvalue the property and so to set at naught fundamental principles that safeguard the taxpayer's rights and property. Rowley v. Chicago & N. W. Ry. Co., 293 U.S. 102, 109-111, 55 S.Ct. 55, 79 L.Ed. 222. The assessment is presumed to have been rightly made on the basis of actual value. Its validity must be tested upon consideration of the facts established by the evidence and of those of which judicial notice may be taken." 297 U.S. 135, at page 139, 56 S.Ct. 426, 428, 80 L.Ed. 532.

The taxing authorities value railroad property by physical methods only, within the state of New Jersey. The railroads contend that that is not due process. Even if the railroads do not admit it, physical valuation is an element that may properly be considered in valuing railroad property for taxation. And it is in use to-day. Of course, a great many other elements may enter into valuation of railroad property, and, perhaps properly, should be considered. But the question here is whether or not the use of the value of physical elements alone is so arbitrary as to amount to a deprivation of due process, that is, did the use of the single method excluding other proper methods result in excessive valuation?

The latter is fundamental in a case of this sort. This is a court of equity and some injury must be shown. Of course, if there is no basis in fact for the assessment, that is enough, but the tax is a property tax and it could only violate due process if it resulted in excessive valuation of the res taxable.

In Union Tank Line v. Wright, 249 U.S. 275, 282 and 283, 39 S.Ct. 276, 278, 63 L.Ed. 602, the court said in reference to the method of evaluating the property of the taxpayers which was taxable in the state of Georgia: "But if the plan pursued is arbitrary and the consequent valuation grossly excessive it must be condemned because of conflict with the commerce clause of the Fourteenth Amendment or both. Western Union Telegraph Co. v. Attorney General of Massachusetts, 125 U.S. 530, 8 S.Ct. 961, 31 L.Ed. 790; Marye v. Baltimore & Ohio R. R. Co., 127 U.S. 117, 8 S.Ct. 1037, 32 L.Ed. 94; Pullman's Palace Car Co. v. Pennsylvania, 141 U.S. 18, 26, 11 S.Ct. 876, 35 L.Ed. 613; Adams Express Co. v. Ohio State Auditor, 165 U.S. 194, 17 S.Ct. 305, 41 L.Ed. 683; Id., 166 U.S. 185, 17 S.Ct. 604, 41 L.Ed. 965; American Refrigerator Transit Co. v. Hall, 174 U. S. 70, 19 S.Ct. 599, 43 L.Ed. 899; Union Refrigerator Transit Co. v. Lynch, 177 U.S. 149, 20 S.Ct. 631, 44 L.Ed. 708; Fargo v. Hart, 193 U.S. 490, 24 S.Ct. 498, 48 L.Ed. 761; Cudahy Packing Co. v. Minnesota, 246 U.S. 450, 453, 38 S.Ct. 373, 62 L.Ed. 827.

In Fargo v. Hart, 193 U.S. 490, 498, 24 S.Ct. 498, 499, 48 L.Ed. 761, the court said: "We come, then, to the real question of the case: whether, the tax provided for by the statute being a tax on property, it sufficiently appears that the board took into account property which it had no right to take into account in fixing the assessment at the large sum which we have mentioned."

The principles were clearly stated by the court in Southern Railway Co. v. Kentucky, 274 U.S. 76, at pages 81, 82, and 83, 47 S.Ct. 542, 544, 71 L.Ed. 934:

"The value of the physical elements of a railroad—whether that value be deemed actual cost, cost of reproduction new, cost of reproduction, less depreciation or some other figure—is not the sole measure of or guide to its value in operation. Smyth v. Ames, 169 U.S. 466, 547, 18 S. Ct. 418, 42 L.Ed. 819. Much weight is to be given to present and prospective earning capacity at rates that are reasonable, having regard to traffic available and competitive and other conditions prevailing in the territory served. No intangible element of substantial amount over and above the value of its physical parts inheres in a railroad that cannot earn a reasonable rate of return on its bare bones—as the mere tangible elements properly may be called. See Omaha v. Omaha Water Co., 218 U.S. 180, 202, 30 S.Ct. 615, 54 L.Ed. 991, 48 L.R.A.(N.S.) 1084. * * *

"If considered alone, the railroad of the Southern Railway Company in Kentucky would be a losing venture. Its operating loss was more than $157,000 per year for the average of the five years reported in the record. But, assuming it a part of the system, it is right to take into consideration the parts outside the state that are operated in connection with it. The mileage used as an integral part of a railroad system may have elements of value that it otherwise would not possess, and the state properly may have regard to the whole in order to ascertain the value of the part that is within its borders. Fargo v. Hart, supra [193 U. S. 490] 499, 24 S.Ct. 498 [48 L.Ed. 761]. But, if the method pursued in valuing property within the state is arbitrary, and the resulting valuation is grossly excessive, the tax must be condemned as in contravention of the due process clause of the Fourteenth Amendment. Union Tank Line v. Wright, supra [249 U.S. 275] 282, 39 S.Ct. 276 [63 L.Ed. 602] and cases cited. It is not permissible for the state to take into account any of the outside property, 'unless it can be seen in some plain and fairly intelligible way that it adds to the value of the road and the rights exercised in the state.' Wallace v. Hines, supra [253 U.S. 66] 69, 40 S.Ct. [435] 436 [64 L.Ed. 782]."

And in Wallace v. Hines, 253 U.S. 66, at page 69, 40 S.Ct. 435, 436, 64 L.Ed. 782, the court said:

"North Dakota is a State of plains, very different from the other States, and the cost of the roads there was much less than it was in mountainous regions that the roads had to traverse. The State is mainly agricultural. Its markets are outside its boundaries and most of the distributing centers from which it purchases also are outside. It naturally follows that the great and very valuable terminals of the roads are in other States. So looking only to the physical track the injustice of assuming the value to be evenly distributed according to main track mileage is plain. But that is not all.

"The only reason for allowing a State to look beyond its borders when it taxes

the property of foreign corporations is that it may get the true value of the things within it, when they are part of an organic system of wide extent, that gives them a value above what they otherwise would possess. The purpose is not to expose the heel of the system to a mortal dart—not, in other words, to open to taxation what is not within the State. Therefore no property of such an interstate road situated elsewhere can be taken into account unless it can be seen in some plain and fairly intelligible way that it adds to the value of the road and the rights exercised in the State."

Again, in Pullman Co. v. Richardson, 261 U.S. 330, at page 338, 43 S.Ct. 366, 368, 67 L.Ed. 682, the court stated that:

"The rule is otherwise with property used in interstate commerce. A state within whose limits such property is permanently located or commonly used may tax it. Cudahy Packing Co. v. Minnesota, 246 U.S. 450, 453, 38 S.Ct. 373, 62 L.Ed. 827; Wells Fargo & Co. v. Nevada, 248 U.S. 165, 167, 39 S.Ct. 62, 63 L. Ed. 190; Union Tank Line v. Wright, 249 U.S. 275, 282, 39 S.Ct. 276, 63 L.Ed. 602. And, if the property be part of a system and have an augmented value by reason of a connected operation of the whole, it may be taxed according to its value as part of the system, although the other parts be outside the state; in other words, the tax may be made to cover the enhanced value which comes to the property in the state through its organic relation to the system. Fargo v. Hart, 193 U.S. 490, 499, 24 S.Ct. 498, 48 L.Ed. 761; Galveston, Harrisburg & San Antonio Ry. Co. v. Texas, 210 U.S. [217] 225, 28 S.Ct. 638, 52 L.Ed. 1031; United States Express Co. v. Minnesota, 223 U. S. 335, 337, 32 S.Ct. 211, 56 L.Ed. 459; Union Tank Line v. Wright, supra.

"In taxing property so situated and used, a state may select and employ any appropriate means of reaching its actual or full value as part of a going concern —such as treating the gross receipts from its use in both intrastate and interstate commerce as an index or measure of its value—and if the means do not involve any discrimination against interstate commerce and the tax amounts to no more than what would be legitimate as an ordinary tax upon the property, valued with reference to its use, the tax is not open to attack as restraining or burdening such

commerce. Cudahy Packing Co. v. Minnesota, supra; St. Louis Southwestern Ry. Co. v. Arkansas, 235 U.S. 350, 367, 35 S.Ct. 99, 59 L.Ed. 265; United States Express Co. v. Minnesota, supra; Galveston, Harrisburg & San Antonio Ry. Co. v. Texas, 210 U.S. [217] 227, 28 S.Ct. 638, 52 L.Ed. 1031; Union Tank Line v. Wright, supra."

To summarize the principles involving the valuation of railroad property is not easy because of the variety of factors that enter into it and the relative freedom of the taxing authorities. Taxation is legislative and not judicial. The federal courts, in particular, have no power to limit the raising of revenue for the state unless the railroads clearly show that they have been deprived of due process or unreasonably burdened in the carrying on of interstate business by bearing an undue share of the tax burden or have been subject to rank discrimination or that property other than that which the state is entitled to tax has been reached. Mere excessiveness in valuation, even though resulting from error of judgment or mistakes on the part of the taxing authorities, is not enough to enable the federal courts to set aside the judgment of the authorized agency of a state.

The state is entitled to assess taxes as it sees fit within those bounds. Obviously, methods used in one state with propriety may be arbitrary in another. It is evident that the geographical position and size of the state of New Jersey have resulted in the making of the matter of the taxation of railroads a problem different than that in probably any other state. Needless to say, it is a far different question than that spoken of by the Supreme Court in the cases involving the great western states where distances are tremendous and large markets and terminal facilities are absent.

The problem was well stated in the recent case of Rowley v. Chicago & Northwestern Ry. Co., 293 U.S. 102, 109, 55 S.Ct. 55, 58, 79 L.Ed. 222:

"The ascertainment of the value of a railway system is not a matter of arithmetical calculation and is not governed by any fixed and definite rule. Facts of great variety and number, estimates that are exact and those that are approximations, forecasts based on probabilities and contingencies have bearing and properly

may be taken into account to guide judgment in determining what is the money equivalent—the actual value—of the property. Mississippi & R. R. Boom Co. v. Patterson, 98 U.S. 403, 407 et seq., 25 L. Ed. 206; Cleveland, C. C. & St. L. Ry. Co. v. Backus, 154 U.S. 439, 445, 14 S. Ct. 1122, 38 L.Ed. 1041; Adams Express Co. v. Ohio State Auditor, 166 U.S. 185, 220, 17 S.Ct. 604, 41 L.Ed. 965; New York ex rel. Brooklyn City R. Co. v. New York Tax Com'rs, 199 U.S. 48, 52, 25 S.Ct. 713, 50 L.Ed. 79; Omaha v. Omaha Water Co., 218 U.S. 180, 202, 203, 30 S.Ct. 615, 54 L.Ed. 991, 48 L.R.A.(N. S.) 1084; Minnesota Rate Cases, 230 U. S. 352, 434, 454, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas.1916 A, 18; Branson v. Bush, 251 U.S. 182, 185–188, 40 S.Ct. 113, 64 L.Ed. 215; Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Comm., 262 U.S. 276, 287, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807; United States y. New River Collieries Co., 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014; Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123–126, 44 S.Ct. 471, 68 L.Ed. 934; Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 155 et seq., 45 S.Ct. 465, 69 L. Ed. 890; McCardle v. Indianapolis Water Co., 272 U.S. 400, 410, 414, 47 S.Ct. 144, 71 L.Ed. 316; Olson v. United States, 292 U.S. 246, 255 et seq., 54 S.Ct. 704, 78 L.Ed. 1236. The apportionment of system value between Wyoming and the rest of the system involves the finding of the value of the portion of the railroad that is located in that State. The problem is quite like the ascertainment of the value of the whole. The determination is to be made in the exercise of a reasonable judgment based on facts so pertinent and significant as to be of controlling weight as indications of the value of the property.

"Where, as in this case, the evidence requires a finding that the railroad in one of the States reached by the system is clearly shown to be worth much less than the average value per mile of the system, an apportionment on mileage necessarily assigns an excessive amount to that State, and the use of that basis as the sole measure for apportionment must be condemned as arbitrary. Fargo v. Hart, 193 U. S. 490, 500, 24 S.Ct. 498, 48 L.Ed. 761; Union Tank Line v. Wright, 249 U.S. 275, 282, 283, 39 S.Ct. 276, 63 L.Ed. 602; Wallace v. Hines, 253 U.S. 66, 69, 40 S. Ct. 435, 64 L.Ed. 782; Cf. Chicago & N. W. Ry. Co. v. Eveland (C.C.A.) 13 F.(2d) 442, 447."

It is undoubtedly true, as the plaintiffs here contend, that their net operating incomes during the ten-year period 1922 to 1931 suffered sharp declines and that meanwhile the assessment of their properties continued to rise, placing them in a position of being obliged to meet increased taxation with diminishing income. The figures offered by the railroads were not the subject of formal proof but were tabulated as follows:

## Lehigh Valley Railroad

| Year | Net Rwy. Op. Inc. before Real Property Taxes (Ex. L.P.–3, 1932–1933 cases) | Net Rwy. Op. Inc. before Real Property Taxes as allocated to N.J. (Ex. L.P. 6 1932–1933 cases) | New Jersey Assessment | Tax |
|---|---|---|---|---|
| 1922 | 2,498,843 | 419,306 | 35,948,639 | 1,285,287 |
| 1923 | 8,422,847 | 1,420,092 | 36,049,998 | 1,328,067 |
| 1924 | 13,730,081 | 2,238,003 | 39,431,682 | 1,457,494 |
| 1925 | 14,665,109 | 2,418,276 | 39,792,747 | 1,459,137 |
| 1926 | 16,202,683 | 2,689,645 | 39,751,686 | 1,456,585 |
| 1927 | 12,308,341 | 2,057,955 | 40,264,262 | 1,513,745 |
| 1928 | 14,712,470 | 2,465,810 | 41,294,624 | 1,580,306 |
| 1929 | 15,470,056 | 2,489,132 | 41,898,848 | 1,597,057 |
| 1930 | 11,298,326 | 1,777,227 | 44,765,010 | 1,799,725 |
| 1931 | 7,436,142 | 1,165,987 | 46,596,877 | 1,894,361 |

## Central Railroad Company of New Jersey

| Year | System Net Railway Operating Income plus Railway Tax accruals (Ex. C.P.–3A 1932–1933 cases) | Net Railway Operating Income as allocated to New Jersey plus Railway Tax accruals (Ex. C.P. 3A) | New Jersey Assessment (Ex. C.P.–6) | Tax |
|------|------|------|------|------|
| 1922 | 6,676,793 | 4,429,150 | 84,047,649 | 2,947,468.05 |
| 1923 | 8,410,216 | 4,206,522 | 85,212,986 | 3,068,178.98 |
| 1924 | 14,668,213 | 8,049,227 | 90,304,746 | 3,284,273.11 |
| 1925 | 11,994,876 | 7,023,295 | 92,423,194 | 3,350,553.05 |
| 1926 | 12,570,008 | 5,511,887 | 92,949,912 | 3,347,168.86 |
| 1927 | 13,985,180 | 7,016,774 | 97,022,887 | 3,584,733.39 |
| 1928 | 14,301,646 | 6,530,196 | 102,132,397 | 3,848,571.45 |
| 1929 | 14,341,093 | 6,814,914 | 102,957,694 | 3,891,636.45 |
| 1930 | 12,156,653 | 6,725,601 | 105,218,047 | 4,168,606.36 |
| 1931 | 9,152,045 | 4,629,950 | 104,837,338 | 4,201,218.79 |

The Lehigh Valley Railroad Company contends that the proportions of the mileage and operations which should be allocated to New Jersey are shown in the following table:

| | | In New Jersey | |
|---|---|---|---|
| | System | Amount | % of System |
| Miles of railroad | 1,361.70 | 141.93 | 10.42 |
| Miles of track | 3,566.08 | 616.51 | 17.29 |
| Freight car miles | 249,121,703. | 35,968,205. | 14.44 |
| Freight train miles | 5,083,285. | 712,458. | 14.02 |
| Passenger car miles | 32,876,157. | 6,143,806. | 18.69 |
| Passenger train miles | 4,125,790. | 678,432. | 16.44 |
| Locomotive miles | 15,063,321. | 2,748,555. | 18.25 |
| Gross ton miles | 9,387,762,000. | 1,462,731,000. | 15.58 |
| | | Combined factors | 15.58 |

(Exhibit LP–2A).

It introduced a statement disclosing that for the ten-year period 1922 to 1931 inclusive the "average net railway operating revenues of its entire Lehigh Valley Railroad system (being the amount available for taxes, interest, rentals, etc.) amounted to $11,674,490." It does not maintain separate records of its earnings and expenses of the operations of the system in New Jersey but contends that this may be estimated by apportioning the entire income in proportion to the all track miles in New Jersey. The result of such a calculation ($11,674,490 x 17.29 per cent.) is $2,018,519, which represents the average annual net earnings of the system from its New Jersey operations.

It argues that the average rate of taxation is 3.75 per cent. and that it is fair to recapture net income to the extent of 6 per cent. Thus, if the said sum of $2,018,519 is capitalized at 9.75 per cent. the total valuation of the railroad's taxable property in New Jersey cannot be more than $20,702,655. In 1932, it was assessed on a basis of $45,694,813.

The Central Railroad Company of New Jersey alleged before the State Board that it recorded its earnings and expenses as a result of its operations in New Jersey separately, and over a period of ten years it averaged the sum of $5,993,752 annually, for its net operating income. This amount capitalized at 9.75 per cent.

produces a valuation of $61,473,846. The state assessed this railroad's property in New Jersey at $103,647,422 in 1932.

It is to be observed that the Lehigh Valley Railroad Company makes its allocation to New Jersey not upon any basis of the combined factors suggested by it, but upon a basis of all track mileage in New Jersey. It justifies the fairness of such calculation by reason of the fact that the tax department of New Jersey issues a printed form upon which each railroad is to make an annual return wherein it is provided for the allocation to New Jersey of system earnings upon the ratio of all track miles in the system, and refers to the statement of Mr. Focht, Chief Engineer of the Railroad Division of the Tax Department, who said: "We make our own investigation or analysis of allocation. Where the system total only is reported, we allocate to New Jersey on the all-track miles, including main track, yard tracks and sidings, which gives consideration to the terminals in New Jersey." (R. p. 100.)

That this reference was in connection with Mr. Focht's testimony as to the determination of franchise value becomes apparent on reading the paragraph containing the above excerpt, which begins as follows: "In order to determine franchise value we use the financial returns, schedules 4 and 5 in the report, showing the debt, stock, earnings and expenses. We use that collaterally. There are other features involved besides earnings. The earnings and expenses in New Jersey are rather hard to determine, the basis on which they are made. The divisions made by the railroad companies are not necessarily used. They are subject to allocation on our part." (R. p. 100.)

There is no other proof upon the part of the railroad that this ratio based upon all track miles truly reflects a value of the terminal facilities and other physical conditions actually existing in New Jersey.

The Central Railroad makes no attempt to base any allocation upon the several factors as suggested in the Lehigh Valley tables. It rests upon its separate record of earnings from operations in New Jersey and contends that a valuation of the railroad property in this state may be obtained from the capitalization of such earnings.

Track mileage of any sort in New Jersey must, of necessity, be limited because of the comparatively small area of the state. On the other hand, the railroads have here some of their most valuable terminals in the country. Hence it is essential that any calculation which allocates to New Jersey a proportion of income in ratio to the property in this state should clearly disclose a reflection of such valuable holdings.

In 1933 the "main stem" and second-class railroad properties were valued at over $433,000,000, divided nearly equally. It is difficult to believe that any other state in the Union discloses a situation where the ratio of terminal and other properties is as high in proportion to the comparatively few track miles as exist in this state. The railroads in these cases refuse to use an estimate of physical properties as any part or factor in their formulæ for ascertaining valuations. The court is inclined to believe that, particularly in this state, it is necessary to give heed to estimates of the value of physical properties if the peculiar status of the property here is to be reflected properly.

The plaintiffs also tabulated the value of their stocks and bonds over a similar ten-year period, but this estimate is also subject to the application of an allocation factor which must be properly representative of the New Jersey properties.

In Great Northern Railway Co. v. Weeks, supra, the Supreme Court said: "The problem of apportionment is a difficult one. It is impossible to formulate a rule generally applicable. Controlling conditions vary greatly from time to time. Allocations to be sufficiently accurate for practical purposes must be arrived at by the exercise of sound judgment based on facts that fairly reflect the relation between value of the system as a whole and value of the part within a state. Rowley v. Chicago & N. W. Ry. Co., supra, 293 U.S. 102, 109, 110, 55 S.Ct. 55, 79 L.Ed. 222."

The burden of establishing that the allocations "fairly reflect the relation between value of the system as a whole and value of the part within a State" is clearly upon the plaintiffs. They assert the allocation and it is only fair that they demonstrate its equitable application. No convincing proof is adduced to show that the

allocation to New Jersey by either the Lehigh theory of all track miles or the Central proposal of proportioning net income present formulae which fairly reflects the relationship in question. The evidence offered in these cases concerning the allocations to New Jersey was in the nature of conclusions bereft of the necessary testimony to sustain it.

However, let us assume that the allocation had been legally proved to have been applied equitably. Let us also bear in mind the breadth of the decision in the last-mentioned Great Northern Railway Co. Case was such as to authorize the rule that "judicial notice must be taken of the fact that late in 1929 there occurred a great collapse of value of all classes of property—railroads, other utilities, commodities and securities, and the depression then commenced progressively became greater. In making the assessments in that period, the Board was bound to take into account and give due weight to the sudden, progressive and enormous declines of value." Still there would be no basis for this court, in these cases, to find a tax against the plaintiffs different from that found by the taxing authorities. The plaintiffs say, in effect, "It is wrong to tax us upon a physical valuation of our properties. We, the Lehigh, should be taxed upon a capitalization of our net income derived through allocating a portion of it to New Jersey by applying the number of all track miles in New Jersey as proportioned to the system. We, the Central, upon a capitalization of that portion of our net income from our New Jersey operation which we have recorded separately." But the proofs are lacking to show the proper inclusiveness of their calculations.

No proof of true value of the railroad property was furnished by the railroads. The assessment by the state is presumed to be legal. The condition of the record is such that the court cannot determine even that the valuation is excessive or improper and, if it had the power, what would be fair and proper methods of valuation, their elements, or comparative weight to be given on consideration.

The tables furnished by the railroads and the state are merely the results of calculations—self-serving conclusions. There is nothing to determine how or why they were reached.

In the absence of an invalid tax, this court is certainly entitled to know the underlying factors before it is called on to declare the assessments of the state authorities invalid or, in effect, at least, declare what a proper system of taxation would be. See Northern Pacific R. Co. v. Adams County (D.C.) 1 F.Supp. 163.

This court has no proof before it of the operating conditions of the railroads either in New Jersey or the systems in relation to New Jersey, of the sources of traffic, extent of terminals, of the marine facilities, of the allocation factors furnished by the railroads or their relative importance to New Jersey conditions. Indeed, there is no proof of the worth of the tables showing the stock and bond values or the net earnings of the railroads or the acceptability of the ten-year test period on which they are based or that the propriety of using the stock and bond method in the case of the Lehigh Valley or the Central Railroad, about both of which the state authorities say that their stock is controlled by other companies or that the net railway operating income should be capitalized at 9.75 per cent. instead of 6.00 per cent., or some other percentage.

It is important to recall that New Jersey is in the center of the greatest metropolitan area of the country and the greatest accumulation of wealth, business, industry, and traffic. The terminals of the railroads of New Jersey are an important part of the Port of New York, which we understand is the largest and most important in the world. We think it is of sufficient importance to repeat what the state authorities say about the railroad's allocation factors:

"In their exhibits (Exs. LP. 2, DP. 3, DP. 5, EP. 2, SWP. 3, NJNYP. 3, NP. 3, NP. 4), plaintiffs arbitrarily adopt eight factors which they use to determine allocation of system values to the State of New Jersey. Those factors are:
1. Road miles (main line and branches).
2. All track miles.
3. Freight car miles.  } Car miles.
4. Passenger car miles.
5. Freight train miles.  } Train miles.
6. Passenger train miles.
7. Locomotive miles.
8. Gross ton miles. (Revenue ton miles).

"1. Road miles is the lineal mileage of the center line of a railroad right-of-way and has nothing to do with the width of the right-of-way, number of tracks, character or number of bridges, tunnels, stations or other improvements, signals, grades, fills, cuts, traffic density, terminals, or other indicia of value.

"2. All-track mileage includes main track, sidings, industrial tracks, etc., but it does not reflect any fair value for terminals because each mile of track on a single track railroad for a thousand miles across the country, where the land is worth a few dollars an acre, is given equal value and weight with each mile of terminal tracks in the most valuable sections of the country. Track mileage bears no relationship whatever to the value of the property upon which the tracks are located, or to structures or improvements thereon.

"3. Freight car miles reflect the miles which the car moves in the train, between originating outer-yard and destination outer-yard, and includes nothing for the movement of the car in either terminal or float bridge service (as in New Jersey) in the harbor.

"4. Passenger car miles are measured only while the cars are in service in the carriage of passengers and does not include the terminal handling or servicing of those cars.

"5. Freight train miles are measured from the outer-yard from which a train starts on its journey, to the outer-yard of its point of destination. They do not include any movement of the cars in the terminals at either end of the line.

"6. Passenger train miles are computed in the same way as passenger car miles, without regard to terminal handling.

"7. Locomotive miles are measured the same as train miles in so far as road movements are concerned, and by an arbitrary of six miles per hour in switching service. Locomotive miles in road service do not include any terminal movement, roundhousing or servicing. Locomotive miles in switching service are figured on the arbitrary, regardless of whether they stand still for one or all of the hours of the day, or whether they move continuously at 20 miles an hour or more. On this basis the casual movement of a switch engine at a division or local line point is credited with the same activity as a switch engine in the busiest terminal on the railroad.

"None of those factors reflect the value of facilities, or the classification and delivery of freight, in terminals or metropolitan or industrial areas, or the value of riparian lands, docks, bulkheads, warehouses, pier sheds, wharves, piers, float bridges, car floats, shop, roundhouse, fueling, storage or warehouse facilities, or other valuable property, in the terminals.

"Defendants submit that any formula or system for allocation which ignores the physical value of property in the terminals, as a separate factor, cannot possibly reflect the true New Jersey proportion of the value of any of these railroad systems." (Defendant's No. 1 brief, pp. 216, 217, 218.)

It is very interesting to note that the railroads vigorously deny the right of the state authorities to take into consideration for any weight the Interstate Commerce Commission's valuation figures. From the evidence presented it would appear that the significance may lie in the fact that those figures may far exceed even the state authorities' valuation of the railroads, although such a deduction is not founded upon the production of the reports themselves but rather from opinions of the Interstate Commerce Commission with reference to applications to the Reconstruction Finance Corporation for loans.

This case is not like Great Northern Railway Company v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532, supra. That was a suit by the Great Northern Railway against the State Tax Commissioner for North Dakota and representatives of 30 counties to enjoin collection of about 40 per cent. of the 1933 taxes on its railroad properties. The assessed value of the taxpayer's property for 1933 was $78,-832,888, $78,850,024 for 1932, and somewhat higher for the preceding three years. The taxing authorities for the state testified that during the period from 1929 to 1933, the basis adopted by them for assessing the system value of railroad property was the five year average of the value of stocks and bonds and capitalized income. In 1933, they obviously used the 1932 valuations giving a reduction only in so far as the value of some re-

moved trackage was concerned. It was equally obvious that if the state in that case had followed its usual procedure the valuation would have been decreased some $13,000,000.

The theory of New Jersey's system of taxation may well be legislatively wrong. The facts brought out in this case cast more than a shadow of suspicion upon an archaic system of levying upon real property, as such, regardless of its income-producing facilities, a tax sufficient in amount to pay for a large proportion of the cost of the government of the state, which in recent years has multiplied itself many times. In other words, in New Jersey where the cost of government has increased by many millions of dollars in the recent past years the legislative body has not seen fit to adjust this tremendous increase in cost by establishing a broader tax base but has maintained the theory that for the most part property, per se, should bear the burden. But the plaintiffs in this case have not suffered in this respect solely and alone. Every property owner in the state has been similarly affected.

The plaintiffs here desire the court to give them relief which, if granted, would substitute the judgment of the court for a remedy which should come to them from the Legislature of New Jersey.

Upon the proper showing by them it is within the realm of possibility and the conception of the opinion in the case of Great Northern Railway Company v. Weeks, supra, that they may be entitled to such relief. However, it cannot be granted to them on the proofs before the court in these cases. It is true that the state for fifty years or more has valued the property of the railroads in New Jersey upon a physical basis without regard to the theories many times approved by the Supreme Court that the best system of taxing railroad property is to evaluate the entire system having regard to the economic as well as the physical value, and then to equitably apportion to the state a valuation proportionate to the extent of the system within the state. On its face this seems indeed an arbitrary position, although notwithstanding in over a hundred legal assaults by railroad companies against the taxing authorities the question has not been raised heretofore. On the other hand, as herein pointed out,

the physical arrangement of the railroad properties in New Jersey with short lines and immense terminals definitely calls for the inclusion of some factor in assessing valuation which will represent that peculiar physical situation. Except as indicated, the plaintiffs refuse to give any consideration to a factor which will express the physical situation. The Lehigh Valley Railroad makes its calculation upon the basis of track mileage. It says that track mileage being the measurement of all the tracks in the state instead of a measurement of the main line necessarily reflects the value of the terminals and other properties. It refers for support of this theory to Pittsburg, etc., Railway Co. v. Backus, 154 U.S. 421, 14 S.Ct. 1114, 38 L.Ed. 1031; Wallace v. Hines, 253 U.S. 66, 40 S.Ct. 435, 64 L.Ed. 782; Northern Pacific R. Co. v. Adams County (D. C.) 1 F.Supp. 163, and other authorities. And it is true that there are implications in these authorities that track mileage may be a representative figure for allocation purposes. There is, however, no attempt to prove that such allocation includes reasonably true or accurate representation of the New Jersey properties. In the brilliant opinion of Judge Webster in Northern Pacific R. Co. v. Adams County, supra, he had before him great masses of testimony upon which he based many of his conclusions and which led him in the final analysis to conclude that effect should be given to the stock and bond values of the system to the extent of 40 per cent.; to the capitalization of income 40 per cent.; and to reproduction cost or physical value 20 per cent. No proofs justifying or sustaining such conclusions are present in these cases.

It is fundamental that this court cannot substitute its notion of what is a proper and fair tax for the acts of the Legislature of the state of New Jersey. The single issue here is to determine whether the rights of the plaintiffs under the Constitution have been violated or whether there has been an interference with interstate commerce. There can be little doubt but what the properties of the railroads are being taxed at high rates, but there is no power in this court to reduce rates of taxation as promulgated by the State of New Jersey as long as such rates are confined within legal boundaries. Many owners of real estate in New Jersey are being subjected to treatment ex-

82

actly coinciding with that of which the plaintiffs. here complain, and relief can only be accorded to them by activating the proper machinery of the state to that end.

The plaintiffs here request relief which would be tantamount to substituting a mode of calculating assessments agreeable to themselves for the method used by the state of New Jersey without supporting their proposal with a foundation of substantial testimony and evidence upon which it may rest.

If we were to hold that the plaintiffs are arbitrarily taxed in excessive amounts in this state in these cases, are we to accept the arbitrary allocation of values by the plaintiffs to New Jersey and so fix the valuations of New Jersey properties without better proof of the justification of such allocations than now appear in the record before us? And if the justification of such allocations were actually conceded, are we to assume that it is within the power of the federal court to then create out of its own opinion what shall be the formula—what percentage of stock and bond value, if any, what percentage of capitalization of income, if any, and what percentage of cost or reproduction value should go to make up the equation from which the total valuation should be found? If this power rests in the court, it is inconceivable that it can be exercised until there is first supplied substantial proofs from which conclusions and reasonable inferences may be drawn. Otherwise, it would not only act in the place of the assessing authorities of the state but would function without the benefit of the facts, technical knowledge and the experience with which an assessing body acts in assessing valuation, or at least should so act.

It is desirable to emphatically point out that this opinion is not to be considered as a justification or an approval of the methods of the taxing authorities of this state in taxing plaintiffs' property. It is held here, rather, that in these cases involving the taxes for the year 1932 the plaintiffs at most have shown that the taxes imposed exceed what they feel they should be taxed, and, upon analysis, the method suggested by them appears as arbitrary as they charge that of the taxing authorities to be, unsupported by the necessary underlying proof of the accuracy of their calculations.

The relief prayed for must be denied and the injunctions heretofore granted dissolved.